CROSS PROPERTIES, INC., et al., Appellants, et al., Plaintiff, v. BROOK REALTY Co., INC., Respondent, et al., Defendants, and DOLLAR LAND HOLDINGS LIMITED et al., Appellants.

Second Department, July 6, 1971.

194

*Wachtell, Lipton, Rosen & Katz* for Cross Properties, Inc., and others and *Greenbaum, Wolff & Ernst* for Dollar Land Holdings Ltd. and others (*Gerald Nolan, Herbert M. Wachtell, Douglas S. Liebhafsky, Bernard W. Nussbaum, Theodore M. Gewertz, Peter D. McKenna* and *Roger Bryant Hunting* of counsel), appellants.

*Stroock & Stroock & Lavan* (*Charles G. Moerdler, Frederick G. Schmidt, Robert D. Steefel, Charles L. Brieant, Jr., Laurence Greenwald, Thomas E. Heftler, Robert P. Stein* and *Bleakley, Platt, Schmidt, Hart & Fritz* of counsel), for respondent.

MUNDER, J.  This litigation was started as a stockholders' derivative action on September 26, 1968 to enjoin the sale to defendant Brook Realty Co. Inc. of three parcels of real property and the improvements thereon, located in Yonkers, New York, Corpus Christi, Texas, and Orlando, Florida. The plaintiffs sought to cancel the proposed sale and demanded damages against the proposed purchaser, the real estate broker and the corporate directors. They obtained a preliminary injunction enjoining the sale, which was set to take place on October 4, 1968, pending trial of the action.

After a nonjury trial an interlocutory judgment was granted in favor of the purchaser, dismissing the amended complaint, adjudging the contract of sale valid, and providing for further proceedings to determine whether and upon what terms specific performance should be decreed and whether and in what amount money damages should be awarded. Thereafter a motion was made, and denied, to modify the interlocutory judgment so as to dismiss the purchaser's cross claim for specific performance or, in the alternative, for summary judgment dismissing the cross claim. The appeals are from the interlocutory judgment and the order denying the motion.

Some background information is essential:  The plaintiffs, collectively, owned approximately 26% of the outstanding shares of the defendant Dollar Land Holdings Limited (hereinafter referred to as " Dollar England "), a publicly held English corporation. Dollar England owned about 90% of the outstanding shares of the defendant Dollar Land Corporation Limited (" Dollar Canada "). Dollar Canada wholly owned the stock of the defendant County Dollar Corporation (" County Dollar "), a New York corporation, which, in turn, wholly owned the defendant Dollar Land Corporation Limited (U. S.) (" Dollar U. S."), also a New York corporation. It was these last two corporations, County Dollar and Dollar U. S., which held the properties in question; County Dollar owned the Cross County Shopping Center in Yonkers while Dollar U. S. owned the Parkdale Shopping Center in Corpus Christi and the Citizens' Bank Building in Orlando.

There was evidence to show there was much overlapping of directors and officers among the various " Dollar " companies (the four corporations mentioned above). There was also evidence that their financial resources were intermingled, that authority to set policy and to make specific decisions regarding the disposition of assets, etc., was generally exercised by the English parent and that the corporate entities were viewed as

a single enterprise by their management. Dollar England, incidentally, was formed in 1959 as a holding company to enable British investors to obtain an interest in North American property.

Sometime in 1966 or 1967 the management of Dollar England decided that their investment venture was not meeting with success and began considering a program to effect an orderly liquidation of the corporate assets. Management decided that all the properties owned by Dollar Canada, County Dollar and Dollar U. S. should be offered for sale and the real estate management firm of Cushman & Wakefield was retained for that purpose.

In the spring of 1968, through Cushman & Wakefield, the Dollar organizations received an offer from one Harry Helmsley, a New York real estate investor, to purchase the three properties for $3,500,000 over existing mortgages, with $500,000 to be paid in cash and the balance by a note, secured by a purchase-money mortgage. Cushman & Wakefield recommended that the Helmsley offer be accepted. On June 11, 1968 the board of directors of Dollar Canada approved the outlines of the Helmsley offer. Three days later Dollar England, through its board of directors, also approved. The corporate officers were authorized to take all necessary action to complete the sale.

Thereafter, however, difficulties arose and the transaction fell through. For one, there was uncertainty about obtaining an extension of a mortgage on one of the properties, which was held by Columbia University. The mortgage, in the amount of $3,000,000, was to become due on October 1, 1968. The Dollar management foresaw difficulties in obtaining an extension or renewal of the mortgage and the companies did not have the financial resources to pay it off when due.

At some point in early September, 1968, after the negotiations with Helmsley terminated, Cushman & Wakefield advised the Dollar management that another party was interested in purchasing the three properties on substantially the same terms as originally discussed with Helmsley. This was the defendant Brook Realty Co. Inc., a Delaware corporation, which was an investment vehicle for its principals, Loeb, Rhoades & Co. and one Leonard Marx. Negotiations led to the signing of a contract on September 13, 1968, which is the subject of the dispute in this case.

The contract called for a cash payment of $200,000 upon signing, which was placed in escrow, and set the closing for October 4, 1968. The aggregate purchase price was slightly in excess of $27,500,000.

On the same day, September 13, 1968, prior to execution of the contract, special meetings of the boards of directors of County Dollar and Dollar U. S. were convened and execution of the contract was authorized. As mentioned, County Dollar was the sole shareholder of record of Dollar U. S., and at the same board meeting, its directors gave their consent to the sale of the two properties owned by the latter. Waivers of notice of the meeting were obtained from the directors not present, but this was not done until after the preliminary injunction was obtained in early October. On September 24, 1968 Dollar Canada, the sole shareholder of County Dollar, adopted the following resolution: "On Motion duly made and carried, it was Resolved that the President of this Corporation Mr. Allen N. Scott is hereby authorized to execute and deliver a consent by this Corporation pursuant to Section 615 of the New York Business Corporation Law to the sale by County Dollar Corporation of its assets to Brook Realty Co. Inc. for the consideration and on the terms and conditions set forth in the agreement made September 13th, 1968 by and among Dollar Land Corporation Limited (U. S.) and County Dollar Corporation as sellers and Brook Realty Co. Inc. as purchaser."

In the meantime the plaintiffs learned of the intent of the management of the Dollar companies to sell the principal assets. (The three properties represented approximately 70% of the assets of the Dollar companies.) The plaintiffs particularly opposed the sale of the Cross County property. They felt the proceeds of sale of the other properties could be used to redevelop Cross County and a redeveloped Cross County could produce profits for the companies. At various times, Edward Gottesman, beneficial owner of plaintiff Farsowin, Ltd., and Sol G. Atlas, beneficial owner of plaintiff Cross Properties, Inc., both of which corporations owned stock in Dollar England, indicated their opposition to the sale to the management of Dollar England. On June 10, 1968, a requisition for an extraordinary general meeting of the Dollar England shareholders was lodged by Gottesman for the removal of a member of the board and for an amendment of the articles of association to require a director to hold at least 1% of the qualifying shares of the corporation. The amendment was rejected at the general meeting on July 25, 1968 for failure to obtain the required two-thirds vote. Only a majority voted in favor of the resolution. Opposition to sale of the properties was raised at the general meeting, but management made no disclosure of the then pending negotiations with Helmsley. On August 26, 1968 a formal requisition was lodged by Gottesman with the board calling for another

general meeting to remove all the directors in view of the majority vote against the board's position. This requisition was rejected by management for technical reasons which subsequently were overturned by the English High Court of Justice. Finally, on October 23, 1968, a meeting was held at which the plaintiffs' group was elected to management control of Dollar England. The new directors thereupon passed resolutions rescinding the prior approval of the September 13 contract. Thus, with their election, the plaintiff stockholders were no longer in this litigation as minority stockholders. They now had management control of the corporations.

The principal issue in this case is whether under New York law a sale of all or substantially all the assets of a New York corporation, which is essentially the wholly owned subsidiary of a twice or thrice removed foreign corporation, must be approved by the ultimate beneficial owners, that is, two thirds of the shareholders of the ultimate parent corporation. That depends upon a construction of section 909 of the Business Corporation Law, particularly the word "shareholder" as used therein. All agree that the sale of the three properties in question by Dollar U. S. and County Dollar, both New York corporations, constituted a sale of "all or substantially all" the assets of those corporations within the meaning of section 909 of the Business Corporation Law. Section 909, insofar as pertinent to this case, provides as follows:

"(a) A sale, lease, exchange or other disposition of all or substantially all the assets of a corporation, if not made in the usual or regular course of the business actually conducted by such corporation, shall be authorized only in accordance with the following procedure:

"(1) The board shall authorize the proposed sale, lease, exchange or other disposition and direct its submission to a *vote of shareholders.*

"(2) Notice of meetings shall be given to each *shareholder of record,* whether or not entitled to vote.

"(3) The *shareholders* shall approve such sale, lease, exchange or other disposition * * * by vote at a *meeting of shareholders* of the holders of two-thirds of all outstanding shares entitled to vote thereon" (emphasis added).

The appellants argue that section 909 was intended by the Legislature to protect the ultimate beneficial owners against the sale of all or substantially all the assets of the corporation by management without prior approval by two thirds of the shareholders. They urge, and not without substance, that when the

assets of a corporation are held by a wholly owned subsidiary, management of the subsidiary could deprive the parent shareholders of this protection unless section 909 is read to require approval by the ultimate beneficial owners. We cannot accept this construction of section 909.

This court is not unmindful of the trend in recent years toward the development of conglomerate corporate enterprises and so-called megasubsidiaries. (See Eisenberg, Megasubsidiaries: The Effect of Corporate Structure on Corporate Control, 84 Harv. L. Rev. 1577–1587.) We recognize that utilization of pyramiding corporations often results in the dilution or denial of many shareholder prerogatives. However, this fact was before the Legislature in 1962 when substantial amendments were made to the Business Corporation Law (L. 1962, ch. 834). Section 909 was amended at that time (L. 1962, ch. 834, § 68). If the Legislature had intended such a departure from the plain language of subdivision (a) of section 909, it would have so indicated. It is clear that the " shareholders " referred to in paragraph (3) are the " shareholder[s] of record " who must receive notice by the terms of paragraph (2). Furthermore, section 909 must be read together with subdivisions (a) and (i) of section 612 of the Business Corporation Law. These two sections make clear that " shareholder " refers to a shareholder of record.

The appellants argue, however, that even if section 909 does not require approval by the ultimate beneficial owners in all cases, it does under the circumstances of this case. The argument runs as follows: County Dollar and Dollar U. S. were mere instruments or departments of their Canadian and English parents; the Dollar group was run as a single enterprise; the three properties which comprised the subject matter of the September 13 contract constituted substantially all the assets of the Dollar group; management of the Dollar companies knew that disposition of these assets was opposed by its principal shareholders; and the contract was entered into on the eve of the directors' ouster from office. Under these circumstances, the appellants argue, section 909 requires that we " pierce the corporate veil " in order to protect the rights of the ultimate beneficial owners. (See *Murrin* v. *Archbald Cons. Coal Co.*, 232 N. Y. 541; *Matter of Bacon*, 287 N. Y. 1; Eisenberg, Megasubsidiaries: The Effect of Corporate Structure on Corporate Control, 84 Harv. L. Rev. 1577, 1590–1602.)

We cannot accept this reasoning. The meaning of " shareholders " in section 909 does not vary from case to case. Such a construction would jeopardize the definiteness required for the orderly transaction of corporate affairs and would substantially

impair the marketability of real estate held by corporate sub-
sidiaries by making the necessity for approval a complex
question of fact.

Furthermore, by urging that we pierce the corporate veil, the
appellants place themselves in an awkward position. Dollar
Canada owns 13 properties in addition to its stock in County
Dollar. Thus, the sale here would not be of all or substantially
all *its* (Dollar Canada's) assets and clearly could not be viewed
as such by Dollar England, which owns about 90% of Dollar
Canada.

In essence, the appellants, in advancing the " piercing " argu-
ment, are claiming a breach of fiduciary obligation of directors
to their shareholders. Ordinarily, knowledge by the directors
of Dollar England that all their shareholders opposed the sale
proposed here would be irrelevant because no approval is
required by the Board of Dollar England to consummate a sale
of the assets of County Dollar or Dollar U. S. However, where
the directors of Dollar England are really making the decisions
and controlling the votes of each of the subsidiaries, their knowl-
edge may be imputed to the directors of the subsidiaries. A sale
thus known to be opposed by the majority of the shareholders
of the parent (although approved by the directors of the sub-
sidiaries) might constitute a breach of fiduciary obligation.

We do not decide that question, however, because we find
that even if a breach of fiduciary obligation by the directors
of the Dollar companies could be established, the September 13
contract is valid and enforceable because Brook was a bona fide
purchaser without notice of any fraud or misuse of power by the
directors. A distinction must be drawn between the absence of
power in a corporation to act (*ultra vires*) and the misuse of
corporate power by the directors. Where the issue is one of
misuse, as in the case at bar, in order to set aside the contract
the evidence must establish that the third party had knowledge
of the fraud on the shareholders (*Bissell* v. *Michigan Southern
& Northern Ind. R. R. Cos.*, 22 N. Y. 258; *Mannheimer* v. *Keehn*,
30 Misc 2d 584, 591–592 [dictum]; *Colorado Springs Co.* v.
*American Pub. Co.*, 97 F. 843; 7 Fletcher, Cyclopedia Corpora-
tions [1964 rev. vol.], § 3555). Although Leonard Marx, one of
the principals of Brook, was aware of the corporate structure
of the Dollar companies, there was no evidence that he knew the
directors were acting contrary to the wishes of a majority of the
shareholders of Dollar England. We find that the conversation
between plaintiff George Farkas and Leonard Marx in the spring
of 1968 did not constitute such notice. Farkas advised Marx
at that time that the latter would never obtain an option on Cross

County. Subsequently, Marx did in fact obtain the option for a period of 10 days. This conversation preceded the date when the plaintiffs obtained voting control of Dollar England.

County Dollar was the shareholder of record of all the shares of Dollar U. S. Dollar Canada was the shareholder of record of all the shares of County Dollar. Consent was required by County Dollar and Dollar Canada pursuant to section 909 of the Business Corporation Law. As for County Dollar, we confirm the finding of the trial court that its consent to the contract was given at the meeting of its board on September 13, 1968. The fact that waivers of notice by the absent directors were submitted after the date of the preliminary injunction in no way affected the validity of that consent. The waivers only represented written confirmation of a previous acquiescence by the absent directors. Further, neither one of the two absent directors objected to the sale or took steps to undo any of the acts (see *Doehler* v. *Real Estate Bd. of N. Y. Bldg. Co.,* 150 Misc. 733).

As for Dollar Canada, we find that the resolution adopted on September 24, 1968 by its board of directors constituted a valid consent within the terms of sections 909 (subd. [a]) and 615 (subd. [a]) of the Business Corporation Law. The minutes of the board meeting constituted a sufficient writing to comply with the terms of subdivision (a) of section 615 (cf. *Hastings Land Improvement Co.* v. *Zinsser,* 155 App. Div. 561).

The actions of the boards of Dollar Canada and County Dollar on October 28, 1968, which purported to rescind their prior consents, were ineffective to invalidate the contract. An offer which is accepted and supported by valuable consideration is enforceable by either party. Repudiation and unwillingness to perform merely constitute a breach of contract (*Handelsman* v. *New York Assoc.,* 31 A D 2d 906). A substantial number of real estate transactions in this State are negotiated through corporate owners. If we were to accept the appellants' position, it would impose a serious obstacle to the sale of real property. It would put the purchaser at the mercy of the selling corporation until title passed. We cannot accept that view of the law.

Since the contract of September 13 was signed, was properly approved under New York law by the selling corporations and their shareholders, and was supported by valuable consideration, it is valid and enforceable, unless tainted by a breach of fiduciary obligations in which the one seeking performance (in this case, Brook) took part. The appellants assert two instances of fiduciary breach. The first, which relates to a breach of fiduciary obligations by the directors in causing the principal assets to be sold while such sale was known to be opposed by a major-

ity of the shareholders of Dollar England, has already been discussed. The second concerns the particular terms of the contract which the appellants contend demonstrate waste of corporate assets and a sale without legitimate business reasons.

We find that the directors of the Dollar companies acted in good faith in determining to bring about an orderly liquidation of the Dollar assets, that the sale price was reasonable in the circumstances, and that the directors perpetrated no fraud on the corporations in entering into the September 13 contract. The test is not whether a better price could have been obtained, but whether the price was so grossly unreasonable as to constitute a waste of corporate assets (see *Richland* v. *Crandall,* 262 F. Supp. 538). Brook, a purchaser without notice, is entitled to specific performance (*Marian* v. *Mariani,* 276 App. Div. 205).

Finally, the appellants argue that under English law the sale of the assets by Dollar U. S. and County Dollar must be viewed as a sale of substantially all the assets of Dollar England, requiring shareholder approval, and that the sale is voidable under English law even after transfer of title. Expert testimony was presented to that effect at the trial. We do not believe that the principles of comity require us to accept that view of the English law, for it would have the effect of allowing England to extend its sovereignty over the powers of New York corporations (cf. *Empire Mills* v. *Alston Grocery Co.,* 4 Willson [Texas Ct. of App., Civ. Cases], § 221 [15 S. W. 200]). Under New York law, no approval is required by Dollar England. If English law has any application it would only be insofar as it determines the rights of the shareholders of Dollar England, vis-à-vis the directors of that company, who, through their actions, have caused this agreement to be signed and approved.

On the issues raised by the appellants regarding the respondent's right to an award of specific performance, we conclude that Brook was ready, willing and able to perform. The appellants claim the sale would be in violation of certain trust indenture agreements between County Dollar and the Royal Bank of Canada Trust Company. Under the indenture, County Dollar was barred from selling its assets unless the purchaser assumed all the obligations of the company. Brook did not do this. However, Dollar England is the holder of more than 90% of the outstanding debentures and, as such, had the authority to waive any violation of the indenture. We deem the concurrence of the directors of Dollar England in the sale to constitute such a waiver. Whether specific performance is possible at this time is a question for the trial court.

204

Accordingly, the interlocutory judgment should be affirmed. The order which denied the appellants' motion to modify the interlocutory judgment or for summary judgment should also be affirmed, on the opinion at the Special Term. In the further proceedings to be had before the trial court it will, of course, be determined whether specific performance should be decreed, under existing circumstances, whether in the circumstances there should be an abatement in the event specific performance is decreed, and whether damages should be awarded in lieu of specific performance. The respondent should be awarded a single bill of costs to cover all the appeals.

HOPKINS, Acting P. J., LATHAM, SHAPIRO and GULOTTA, JJ., concur.

Interlocutory judgment of the Supreme Court, Westchester County, dated December 9, 1969, and order of the same court dated July 2, 1970, affirmed, with a single bill of costs to respondent to cover all the appeals.