CROSS PROPERTIES, INC., et al., Respondents-Appellants, v BROOK REALTY CO., INC., Appellant-Respondent, et al., Defendants; COUNTY DOLLAR CORPORATION et al., Defendants-Respondents-Appellants. FEDERAL INSURANCE COMPANY, Respondent-Appellant.

Second Department, August 4, 1980

**APPEARANCES OF COUNSEL**

*Stroock & Stroock & Lavan (Charles G. Moerdler, Robert D.*

*Steefel, Eva L. Coben, Bruce H. Schneider* and *Sylvia L. Shapiro* of counsel), for appellant-respondent.

*Reavis & McGrath (Lawrence W. Boes, Paul D. Baiocchi* and *Ralph C. Dawson* of counsel), for Cross Properties, Inc., and others, respondents-appellants.

*Greenbaum, Wolff & Ernst (Roger Bryant Hunting* and *Leo Kayser, III,* of counsel), and *McCarthy, Fingar, Donovan, Glatthaar, Drazen & Smith (Arthur D. Brennan* and *Raymond P. O'Keefe* of counsel), for County Dollar Corporation and others, respondents-appellants.

*Shea, Gould, Climenko & Casey* for George Farkas, respondent-appellant.

*Wachtell, Lipton, Rosen & Katz* for Farsowin Ltd., and others, respondents-appellants.

## OPINION OF THE COURT

TITONE, J.

The matter before the court on appeal stems from a stockholders' derivative action brought on September 26, 1968 to enjoin the sale to defendant Brook Realty Co., Inc. (Brook) of three parcels of real property and the improvements thereon, located in Yonkers, New York, Corpus Christie, Texas, and Orlando, Florida. The plaintiffs, owners of approximately 26% of the outstanding shares of the parent realty company which controlled the parcels through its corporate subsidiaries and favored the sale, sought to cancel the proposed sale to Brook. They also demanded damages against the proposed purchasers, the real estate brokers and the directors of the parent and subsidiary realty companies. A preliminary injunction enjoining the sale set to take place on October 4, 1968 was obtained by plaintiffs, pending trial of the action.

After a nonjury trial an interlocutory judgment, entered December 9, 1969 (COYLE, J.), was granted in favor of the purchaser Brook. The contract of sale was adjudged valid, the amended complaint of plaintiffs was dismissed, and provision was made for further proceedings to determine, *inter alia,* whether and on what terms specific performance should be decreed, and whether and in what amounts money damages should be awarded. This court affirmed the interlocutory judgment of the late Justice COYLE on July 6, 1971 *(Cross Props. v Brook Realty Co.,* 37 AD2d 193, affd 31 NY2d 938,

mot for rearg den 32 NY2d 833). In his opinion affirming such judgment, former Justice MUNDER of this court stated (p 204) that the trial court in the ensuing proceeding was to determine "whether specific performance should be decreed, under existing circumstances, whether in the circumstances there should be an abatement in the event specific performance is decreed, and whether damages should be awarded in lieu of specific performance."

After a lengthy trial on the specific performance issue and other matters, Mr. Justice BURCHELL directed, *inter alia,* that Brook be granted specific performance, denied its claim for damages resulting from increased construction costs of the Cross County Shopping Center incurred during the delay caused by the breach of the contract of sale, awarded Brook damages for loss of net rental income from October 1, 1968 to December 31, 1975, in the sum of $5,575,588, and awarded Brook counsel fees incurred in attempting to vacate the preliminary injunction obtained by plaintiffs on October 4, 1968, to the extent of legal services rendered to prove those items of damage caused by the injunction, etc. However, the trial court denied the claim of Brook to recover other damages sustained by reason of the preliminary injunction, such as counsel fees incurred in seeking specific performance and abatement.

Brook appeals from the denial of its claim for damages representing the increased cost of construction pertaining to redevelopment of the Cross County Shopping Center. Plaintiffs and defendants County Dollar Corporation and Dollar Land Corporation Limited (U. S.), in their cross appeal, challenge the propriety of the trial court's granting of damages to Brook with respect to net rental income. Both sides argue that the award of counsel fees to Brook expended with respect to the preliminary injunction was improper. The purchaser, Brook, urges that the award was inadequate since it was also entitled to counsel fees incurred in all proceedings, trial and appeals, both prior and subsequent to the issuance of the preliminary injunction. Plaintiffs Cross Properties, Inc., *et al.* assert that any award of counsel fees under the bond filed by them in obtaining the preliminary injunction was improper since there was no determination by the trial court that the preliminary injunction was improvidently granted.

### PRIOR HISTORY OF CASE

Plaintiffs, collectively, owned approximately 26% of Dollar

Land Holdings Limited (Dollar England), a publicly held English corporation. Dollar England owned about 90% of the outstanding shares of Dollar Land Corporation Limited (Dollar Canada), which in turn was the sole shareholder of County Dollar Corporation (County Dollar), a New York corporation. The latter owned Dollar Land Corporation Limited (U. S.) (Dollar U. S.), also a New York corporation. County Dollar was the owner of record of the Cross County Shopping Center in Yonkers while Dollar U. S. owned the Parkdale Shopping Center in Corpus Christi, Texas, and the Citizens' Bank Building in Orlando, Florida. Dollar U. S. and County Dollar are codefendants and cross-appellants on appeal.

In the 1960's Cross County Shopping Center was sold to the Dollar companies. County Dollar took title. Thereafter the same companies secured ownership of the Texas and Florida properties. However, in 1967 the management of Dollar England decided that all the properties owned by its three subsidiary Dollar companies in this hemisphere should be sold because the investment venture was not successful. In September, 1968, after one prospective transaction had been aborted, the real estate firm of Cushman & Wakefield advised the management of Dollar that Brook, a Delaware corporation, was interested in purchasing the three properties for its principals, Loeb Rhoades & Co., and one Leonard Marx. The parties entered into a contract on September 13, 1968. Prior to the signing of the contract on that day, the board of directors of County Dollar and Dollar U. S. convened and authorized the execution of the contract. On September 24, 1968 Dollar Canada adopted a resolution in which it consented to the sale pursuant to the terms of the September 13 contract. The aggregate purchase price for the three properties was $27,515,033.12. A cash payment of $200,000 was to be made on signing of contract, and the closing was set for October 4, 1968.

However, plaintiffs, owners of approximately 26% of Dollar England, as mentioned earlier, were opposed to the sale, particularly the sale of the Cross County property. They believed the proceeds of the sale of the out-of-State properties should be used to redevelop Cross County and thereby produce profits for the companies involved in the venture. Plaintiffs, on September 26, 1968, brought the within stockholder's derivative action to enjoin the sale of the properties. On October 23, 1968 plaintiffs were elected to the control of the parent

company, Dollar England, which action also gave them management control of the other Dollar companies. As also indicated earlier, the late Justice COYLE found the agreement to sell the subject properties to Brook was valid and set down the issue of specific performance for a future proceeding. A fuller statement of background information in this case may be found in the opinion of former Justice MUNDER of this court affirming the determination of the late Justice COYLE (37 AD2d 193, *supra*).

Although the parties did close title on November 1, 1977, in their cross appeal plaintiffs and defendants County Dollar and Dollar U. S. indicate that they were appealing from the granting of such relief by Justice BURCHELL. However, in their brief on appeal plaintiffs and defendants County Dollar and Dollar U. S. do not allege as error per se the granting of such relief to Brook. Rather, in the seven points set forth in their brief, plaintiffs, and defendants County Dollar and Dollar U. S., alternately support the trial court's denial of Brook's claim for damages for increased costs of redevelopment of the Cross County Shopping Center (the Center) and plaintiffs support the restrictions the trial court placed on Brook's claim for counsel fees for efforts expended by it to vacate the preliminary injunction; and then allege as errors the trial court's awarding Brook the net rental income and granting recovery to Brook of attorney fees on the injunction bond.

### INCREASED COST OF CONSTRUCTION FOR REDEVELOPMENT

In an exhaustive opinion, Mr. Justice BURCHELL noted that prior to entering into the contract of sale with Brook, the sellers had come to the conclusion that for competitive reasons it was necessary that the shopping center in Yonkers be redeveloped. A study (the Erdman report) commissioned by the management of the Dollar companies before 1968, in recommending redevelopment, proposed that it be carried on in three stages and that the contemplated construction provide for additional tenant space, additional parking, a theatre, an air-conditioned mall, and a third department store. Apparently the purchaser knew that the sellers had intended to redevelop the Yonkers property before the contract was entered into. It was also evident that the syndicate of parties comprising defendant Brook, the nominal purchaser, also intended to engage in a project of redevelopment. Actually, the principals of both parties discussed the need for redevelop-

ment and the vendors supplied the purchaser with the plans, cost estimates and brochures prepared and disseminated in connection with the Erdman report. *However, the contract of sale was silent with respect to the question of redevelopment.*

Notwithstanding the absence of any specific clause placing upon the buyer the obligation to redevelop the center, Brook contends that its contractual obligations to effect redevelopment were incorporated by reference into the body of paragraph 23 of the agreement. In general terms, paragraph 23 required Brook, on or before the closing on October 4, 1968, to obtain an extension or refinancing of a three million dollar second mortgage held by Columbia University and due October 1, 1968, for a period at least as long as the term of the three million dollar purchase-money mortgage, a condition precedent to the sale. Brook also agreed to pay all interest and payments of principal under the mortgage on its extension or replacement. The contract of sale also contained the usual "merger" clause, i.e., that the parties agreed that all understandings and agreements between the parties were merged in the contract, and the usual express prohibition against any modifications or termination except in writing signed by the sellers, etc.

Implementing the provisions of the contract pertaining to Brook obtaining an extension of the second mortgage held by Columbia University was an escrow agreement between the parties which required a law firm to hold the contract in escrow until receipt of a commitment letter by Columbia University to extend its second mortgage. The letter had to contain, *inter alia,* a six and one-half year extension, 12% interest payable in advance for the first five years of the extension, etc., and amortization payments set by Columbia for the last one and one-half years of the extension period. *Nowhere in the escrow agreement signed by the sellers was any reference made to redevelopment of the Center.* However, in the ensuing commitment letter not only did Columbia and Brook agree to the three requirements of the escrow agreement, but also agreed that Brook *"will agree to use its best efforts to air condition and enclose the Mall area and install double deck parking"* (emphasis supplied).

The trial court rejected the claim by Brook for damages stemming from the increased cost of redeveloping the shopping center in Yonkers on the grounds, *inter alia,* that Brook failed to establish that it had suffered any damages in that

regard, that its obligation under the commitment letter with Columbia was uncertain and speculative in that its "best efforts" were limited by its ability to perform which it failed to prove and, in effect, that Brook never had an actual redevelopment plan.

■ On appeal Brook argues that, contrary to the trial court's determination on this issue, it had a contractual obligation to redevelop, that the vendors willfully breached the agreement, that by reason of such breach redevelopment was delayed for the approximate 10-year period Brook was prevented from taking title to the premises and that during this period construction costs drastically increased. Brook also argues that the trial court erred in not awarding it the increased cost of redevelopment either as general or special damages. I disagree with the arguments advanced by Brook on the redevelopment facet.

It is undenied that the Center was in need of redevelopment. Indeed, the sellers seriously considered engaging in such endeavor prior to contract negotiations, as evidenced by their retaining an architectural firm to prepare work drawings and specifications for construction, and paying the firm $375,000 for those services. It is also true that in the Erdman report stemming from the architectural firm's efforts, a two-phase construction program was set forth, and that the plan for redevelopment of the Center, along with cost estimates and a related brochure, were furnished the purchasers by the vendors. Yet despite these and other facts demonstrating that redevelopment was a topic seriously considered and discussed at length by the parties, the Brook agreement, very detailed and negotiated at length, does not contain a scintilla of language within its four corners indicating that Brook was obligated thereunder to redevelop the center either under the Erdman plan or any other plan. The Brook agreement set forth a selling price in excess of $27,000,000, and referred to numerous and complicated mortgage transactions running into millions of dollars. Yet Brook's alleged contractual obligation to redevelop, which Brook in its brief on appeal posits as "an integral part of the Agreement" without which no contract could have arisen, is found nowhere therein. To me it seems inconceivable that had the parties to the Brook agreement actually intended that Brook would be contractually obligated to redevelop the Center they would have failed to spell out such obligation in detail in the multipage contract in

dispute. To the extent that such an agreement might have been entered into orally by representatives of the parties to the contract of sale, such understanding would be rendered nugatory by the merger clause of paragraphs 26 and 27 of the written agreement and, probably, the Statute of Frauds (see General Obligations Law, § 5-701, subd a, par 1).

Brook also contends that the contractual obligation to redevelop the shopping center in Yonkers was incorporated by reference into paragraph 23 of the contract of sale which stated, *inter alia:* "Purchaser agrees * * * to comply with all the terms and provisions of such [Columbia University] mortgage or its replacement or extension". According to Brook, that clause incorporated the Erdman plan or report when read in tandem with the clause in the Columbia commitment letter of September 18, 1978 that Brook "will agree to *use* its best efforts to air condition and enclose the Mall area and install double deck parking" (emphasis supplied).

Brook is correct when it states that contracts containing "best efforts" or similar clauses have in certain situations been held to be enforceable (see, e.g., *Wood v Duff-Gordon,* 222 NY 88, 92 [CARDOZO, J.]; see, also, *Scientific Mgt. Inst. v Mirrer,* 27 AD2d 845). In *Wood v Duff-Gordon (supra)* defendant, a "designer of fashions" for women whose certificate of approval on feminine apparel was sought by manufacturers of such items, entered into an agreement with plaintiff, Wood, to help her turn this vogue into a financial benefit. Defendant gave Wood the exclusive right for a year, subject to her approval, to place her indorsement on the designs of others and in return she was to have one half of all profits and revenues derived from any contract he might make. In the action for damages by Wood, in which he alleged that defendant had breached the contract by placing her indorsement on articles without his knowledge and withholding the profits, defendant demurred to the complaint on the ground that the agreement lacked the elements of a contract in that plaintiff did not bind himself to do anything. According to defendant, her sole compensation for the grant of the exclusive agency was to be one half of all the profits resulting from plaintiff's best efforts. Unless he gave his efforts, she could never receive anything.

However, Judge CARDOZO in his opinion noted that the agreement did not stop there since plaintiff also promised to account monthly for all moneys received by him, and to take

out all such patents, copyrights and trademarks as he believed would be necessary to protect the articles affected by the agreement. Thus, in determining the intention of the parties, Judge CARDOZO held *(supra,* p 92) that the promise had a value in that it helped to enforce the conclusion that plaintiff had some duties and that his promise "to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly", was a promise to use reasonable efforts to bring profits and revenues into existence. Simply put, implicit in the reasoning in *Wood* is the necessity that there exist an objective set of guidelines against which one's "best" or "reasonable" efforts may be measured.

Similarly, objective guidelines for enforcement were also impliedly found in the *Scientific Mgt. Inst.* case *(supra).* In that case defendant terminated his employment with plaintiff, and in violation of the restrictive covenant in the employment contract with plaintiff accepted employment shortly thereafter with a client of plaintiff. This court rejected defendant's contention that the employment contract lacked mutuality of obligation since plaintiff was under a duty to use its best efforts to provide defendant with work and not to refuse unreasonably to consent to other employment of defendant in the event plaintiff had no work to assign him.

However, in the matter on appeal nowhere in the Columbia University letter is there any indication, for example, that Brook would use its best efforts either to implement all or a portion of the Erdman plan, or have an alternate plan drawn up and implemented. As the trial court succinctly observed, Brook could scrap the Erdman plan, implement an entirely different scheme of development, or even refuse redevelopment and not be in violation of the Columbia agreement.

The case of *Regan v Lanze* (47 AD2d 378, revd on other grounds 40 NY2d 475) presented a problem somewhat analogous to the one herein. In *Regan* the vendors refused to correct certain alleged defects in the marketability of their title. As a result the purchasers commenced an action for specific performance. Closing of title was delayed some 22 months after the original date set for closing. With respect to costs directly attributable to the delay in closing title, plaintiffs sought, *inter alia,* the increased costs of construction. The Appellate Division, Fourth Department, rejected the claim on the ground that (47 AD2d, at p 383): "Plaintiffs list five items of direct and consequential loss due to defendants Lanzes'

failure to convey marketable title on the original date of closing, for which plaintiffs contend there is support in the record. *The first of these is for increased costs of construction of planned improvements. This item of increased costs of improvements does not have that ring of clear predictability of consequence for which an unsuccessful good faith litigant should ordinarily be held responsible* (see, generally, *Stevens v Central Nat. Bank,* 168 NY 560, 566, 567). Recovery for this claimed damage should be denied." Nor does the case of *Yonan v Oak Park Fed. Sav. & Loan Assn.* (27 Ill App 3d 967), a case described by Brook as "strikingly similar to the instant case", warrant overruling the trial court on this issue. In *Yonan* plaintiffs agreed to exchange two parcels of realty for a parcel of land owned by defendant Oak Park. Pursuant to the agreement, Oak Park was contractually obligated to build a 6,000 square foot store on the parcel of land prior to conveying it to plaintiff. Closing was delayed and specific performance was eventually decreed. However, Oak Park had breached its contractual obligation to build on the property. On appeal, the plaintiff was awarded damages representing the cost of the building together with the *increased* cost to construct it at that point. The difference between *Yonan* and this case is patent: in the matter at bar Brook's contractual *obligation* to redevelop is nebulous, whereas Oak Park's obligation was clearly spelled out within the four corners of the instrument. Nor does Brook find support in its argument that the amount of Brook's damages was not speculative in view of the fact that the Erdman phase I and II plan had been reduced to a dollar and cents figure. As mentioned above, there simply was never any requirement for Brook either to implement the Erdman plan, or to propose and implement another plan. At best, there was an agreement to agree, illusory in its terms. Accordingly, I would affirm the trial court's denial of damages for increased costs of construction.

DAMAGES FROM DELAY IN PERFORMANCE; TENDER

With respect to Brook's right to damages for net rental income after the scheduled closing date, October 4, 1968, until the actual closing date, Justice BURCHELL rejected the contention that Brook was responsible for the delay in performance and thus should not profit from its own wrongdoing. Such damages were computed by Justice BURCHELL to be $2,123,657 to December 31, 1974 with a further provision that Brook

could apply for a supplemental computation of net rental income accruing for periods after that date.

■ On appeal plaintiffs and defendants County Dollar and Dollar U. S. urge that the award of net rental income to Brook for the period in question was erroneous. They assert that since Brook rejected their tender offer in March, 1970 it was estopped from receiving such damages for the period subsequent thereto. Plaintiffs and defendants County Dollar and Dollar U. S. chose to characterize the tender offer of March, 1970 as unconditional in that it was not contingent upon Brook's relinquishment of its claims for damages flowing from plaintiffs' breach of the contract of sale. I disagree with plaintiffs' conclusions.

Despite plaintiffs' avowal that the written tender of the subject properties on March 24, 1970 was "unconditional", language contained therein indicates otherwise. Specifically, the tender offer of that date provided, *inter alia,* that it was: "[W]ithout prejudice to our right * * * to defend against and oppose any claims for damages which may be made by you or any other person arising out of the transactions covered by the Agreement * * * Solely in connection with such defense, we * * * reserve our right to appeal * * * *and to challenge the basic validity of the Agreement."* (Emphasis supplied.)

The net practical effect of the tender with the inclusion of the above provision would have been to compel Brook to accept belated tender of title, while reserving to the sellers the right to contest Brook's entitlement to damages and/or abatement of the purchase price,* thereby forcing Brook to proceed with a purchase of the real property without knowing the purchase price and without assurance that the agreement itself would not be invalidated on appeal years after Brook took title under the so-called "unconditional" tender. Such offer on its face was far from "unconditional".

### DAMAGES ARISING FROM ISSUANCE OF PRELIMINARY INJUNCTION

In a decision dated October 4, 1968, Mr. Justice Sirignano granted plaintiffs a preliminary injunction enjoining the sale pending an early trial. Plaintiffs, pursuant to CPLR 6312

---

* Although not raised as error on appeal, it should be noted that Mr. Justice Burchell did award Brook an abatement of the purchase price in the sum of $434,682 because some of the land subject to the agreement had been condemned.

(subd [b]), posted an undertaking in the sum of $1,000,000. Both at trial and on appeal Brook claimed it is entitled to damages including but not limited to counsel fees incurred in all proceedings, trials and appeals, both prior and subsequent to the issuance of the injunction *pendente lite*. At the other extreme, plaintiffs Cross Properties *et al.* maintained that no damages were forthcoming absent an explicit determination that the injunction was improperly granted.

The trial court did not accept the argument of either side *in toto* but, instead, granted damages for counsel fees to Brook limited to the following: *"Brook is awarded counsel fees to the extent that such obligations were incurred in attempting to vacate the procedural remedy.* Any obligations with respect to the trial of the action [before the late Justice COYLE] and the appeal therefrom are not properly recoverable under the bond. *Further, Brook is awarded counsel fees incurred by reason of [this] hearing to the extent that counsel services were rendered in an attempt at proving damages.* To this end the Court will allow counsel fees for services rendered at the hearing to prove those items of damages which are specifically enumerated in this decision. *Counsel fees incurred in seeking specific performance and abatement are denied."* (Emphasis supplied.)

The language of the applicable statute (CPLR 6312, subd [b]) reads: "Undertaking. Except as provided in section 2512, prior to the granting of a preliminary injunction, the plaintiff shall give an undertaking in an amount to be fixed by the court, that the plaintiff, *if it is finally determined that he was not entitled to an injunction,* will pay to the defendant all damages and costs which may be sustained by reason of the injunction". (Emphasis supplied.)

■ Plaintiffs Cross Properties *et al.* cite *Margolies v Encounter, Inc.* (42 NY2d 475) to buttress their argument that there must be an *explicit pronouncement* that the injunction was "improvidently granted" before any damages may be awarded as a result of the preliminary injunction. I disagree with such interpretation of *Margolies*. *Margolies* stands for the propositions (a) that the ultimate denial of a permanent injunction to plaintiff or a determination that a plaintiff is not entitled to prevail in the final outcome, does not constitute a determination that plaintiff was not entitled to a preliminary injunction, and (b) that a finding must appear, either expressly or by implication, in the trial court's decision prior to the granting

of damages that plaintiff was not entitled to the preliminary injunction.

A reading of *Margolies* does support Cross Properties' contention that an actual determination that plaintiff was not entitled to a preliminary injunction is necessary. However, nowhere in *Margolies* does the Court of Appeals state that an Appellate Division or trial court may not render an implicit determination in that regard. In fact, the Court of Appeals in *Margolies* held that such a determination was made by the Appellate Division, First Department, when that court stated that " 'the injunction rests on no foundation at all and must be vacated' " (42 NY2d, at p 481).

A search of the record in this case reveals an implicit determination analogous to the one referred to in *Margolies (supra)*. In the decision upholding the Brook agreement, the late Justice COYLE noted that "[b]ut for the intervention of this Court, the Court finds that title would have closed on October 4, 1968". He also stated later in his opinion that "[a]lthough the purpose of an injunction pending trial is in general to maintain the status quo of the parties until the Court may resolve the equities between them, the injunction did not have that effect in this case, since during the interim" many changes occurred. Finally, in the ensuing order of December 9, 1969, the late Justice COYLE vacated the preliminary injunction and permitted Brook to "move to ascertain any damages sustained by reason of said preliminary injunction." Such statements when read *in pari materia* satisfy the *Margolies* requirement that there be a determination that a plaintiff was not entitled to a preliminary injunction.

As for the underlying decision, I agree with Justice BURCHELL that counsel fees were recoverable only insofar as they pertained to vacating the procedural remedy, and presenting evidence at the later hearings of such legal services. *The law is reasonably clear: any party wrongfully enjoined may recover only damages and costs "which may be sustained by reason of the injunction"* (CPLR 6312, subd [b]). As the trial court correctly found, the party seeking such damages bears the burden of proof on each element of his claim (see *Brace Co. v Kraft*, 196 NY 468; *Kane v Harris*, 277 App Div 895; *Maltz v Westchester County Brewing Co.*, 167 App Div 95; see, also, 7A Weinstein-Korn-Miller, NY Civ Prac, pars 6312.14 and 6312.15).

While counsel fees are recoverable as one element, this is

only as it relates to the preliminary injunction, and not the underlying issues or trial (see *Hovey v Rubber-Tip Pencil Co.,* 50 NY 335; *Maltz v Westchester County Brewing Co., supra;* but see *Eisen v Post,* 15 Misc 2d 59, 63). The rationale is correct since counsel fees were not paid at common law and generally are a creature of statute (compare CPLR 8301 with Domestic Relations Law, § 237). Such a rule has been expressly approved by Weinstein-Korn-Miller, where it is observed: "In *Maltz v. Westchester County Brewing Co., the court segregated the services rendered in procuring the dissolution of the injunction from the services rendered in the main suit* and only awarded reimbursement for the legal fees attributable to the former. Cf. ¶¶ 6112.10, 6212.12. *To the extent that it is possible to distinguish costs in this way, the Maltz approach seems sound. If the preliminary injunction had not been obtained, these same costs of trial would have been incurred in the defense of the main action.* Adding these attorney's fees to the burden of a losing plaintiff who obtained an injunction has the effect of imposing a penalty upon him, especially in light of New York's policy against awarding attorney's fees as costs. See ¶ 8301.04. The only reason for permitting such a penalty would be to create an added deterrent against seeking preliminary injunctions. However, there is nothing inherently wrong in such provisional relief and when the plaintiff believes he needs it he should not be inhibited from applying for it by the threat of penalties." (7A Weinstein-Korn-Miller, NY Civ Prac, par 6312.15, p 63-132; emphasis supplied.)

Brook, citing *Eisen v. Post (supra),* argues that "[c]ounsel fees and expenses incurred during trial are recoverable where a plaintiff's right to injunctive relief is the primary object of and inseparable from the merits of the action" which, it is alleged, are the circumstances herein. This ignores the fact that on October 23, 1968, the old directors of Dollar England were ousted, and the new leadership together with the shareholders repudiated the Brook agreement *in toto.* Hence, as of that date, the preliminary injunction was for all practical purposes rendered moot. Brook also argues that the late Justice COYLE's statement that *"[b]ut for the intervention of this Court,* the Court finds that title would have closed on October 4, 1968", supports its contention that the preliminary injunction and the ultimate merits of the action were inseparable. This argument was correctly rejected by Mr. Justice

BURCHELL when he stated: "[A] dissolution of the injunction prior to October 23, 1968 would *not* have rendered the issue at the trial moot. The plaintiffs could still have proceeded to set aside the conveyance if title had closed. Accordingly, the trial did not essentially involve the issue of whether or not the plaintiffs should have an injunction. The injunction herein was merely incidental so as to retain title in the vendors pending the suit." (Emphasis supplied.) Essentially, the issue before the trial court initially was the authority of Dollar's stockholders, Nicholson and Scott, to enter into the agreement with Brook without the approval of Dollar England.

Accordingly, the determination of Mr. Justice BURCHELL limiting Brook to counsel fees incurred by it in attempting to vacate the preliminary injunction together with counsel fees for legal services incurred in the trial before him with regard thereto should not be disturbed.

The judgment of the trial court should therefore be affirmed, without costs or disbursements.

HOPKINS, J. P., GULOTTA and COHALAN, JJ., concur.

Judgment of the Supreme Court, Westchester County, entered September 28, 1977, affirmed, without costs or disbursements.