**PINNACLE BOOKS, INC., Plaintiff,**

v.

**HARLEQUIN ENTERPRISES LIMITED, Defendant.**

**No. 81 Civ. 0641 (KTD).**

United States District Court, S. D. New York.

May 13, 1981.

On Motion For Reargument May 15, 1981.

Burns Jackson Summit Rovins & Spitzer, New York City, for plaintiff; John L. Amabile, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Thomas C. Morrison, Christine H. Miller, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This is an action for a permanent injunction and damages resulting from the allegedly unlawful interference of defendant Harlequin Enterprises Limited ["Harlequin"] with the contractual relationship between plaintiff Pinnacle Books, Inc. ["Pinnacle"] and its most successful author, Don Pendleton ["Pendleton"]. Pinnacle claims that Harlequin induced Pendleton to breach his contract with Pinnacle and to enter into an agreement with Harlequin pursuant to which it will publish new books in or relating to a series of paperback men's action/adventure books entitled "The Executioner" [sometimes referred to herein as the "Series"]. Pinnacle now moves for summary judgment.

## I.

Pinnacle is a publisher of mass-market and trade paperback books. The company has offices in New York City and Los Ange-

les. It has been publishing "The Executioner" series since the inception of the series in 1969. Pinnacle has published thirty-eight different titles in "The Executioner" series and sold approximately twenty million copies. Pendleton, the author of the Series, is the copyright owner of the Series.

In 1976, Pinnacle and Pendleton entered into an agreement whereby Pinnacle agreed to publish books 29 through 38 in "The Executioner" series. The 1976 Agreement provided, *inter alia*, that Pendleton would not offer rights in "The Executioner" series to any other publisher until, after extending their best efforts, Pinnacle and Pendleton, were unable to agree on the terms of a new contract for the Series. In the event that the parties were unable to consummate a new contract, Pendleton was free to offer the Series to other publishers so long as any new publication did not occur for three months following the first publication of book 38 by Pinnacle. The pertinent provision provides:

VII. The Author grants the Publisher the option to renew this contract for the books in THE EXECUTIONER series following the ten books covered hereby on terms to be agreed, and, if, after extending their best efforts, the parties are unable to reach an agreement thereon, then Author shall be free to offer rights in such other books in THE EXECUTIONER series to any other publisher, provided the publication thereof does not occur until the expiration of 3 months following the first publication of the tenth book hereunder.

The manuscript for the last book under the 1976 Agreement was delivered to Pinnacle on December 14, 1979. By that time, Andrew Ettinger, the Editorial Director of Pinnacle, had begun negotiations with Pendleton for an extension of the 1976 Agreement. These discussions between Ettinger and Pendleton occurred as early as September 8, 1978 and continued until November, 1979, at which time Ettinger left Pinnacle and joined Harlequin. According to Ettinger, he was unable to consummate a renewal of the 1976 Agreement before he left Pinnacle because an outstanding dispute between Pendleton and Pinnacle regarding foreign royalty rights had not been resolved. By late 1979, however, an acceptable resolution of the dispute had been reached and Pendleton was ready and willing to discuss an extension of the 1976 Agreement.

Negotiations between Pinnacle and Pendleton continued until about February 10, 1980. According to Pinnacle, the discussions had been congenial and the conditions established by Pendleton had either been satisfied in full or could have been met if the parties had proceeded with the negotiations in good faith and using their best efforts.

Meanwhile, Harlequin, a Canadian publisher and distributor of paperback books throughout the world, also had developed an interest in Pendleton. Having achieved spectacular success in the romance novel market, Harlequin was exploring the feasibility of entering the action/adventure line of book publishing. Ettinger, who was now affiliated with Harlequin, began meeting with Pendleton in early January, 1980, to discuss the possibility of Harlequin becoming Pendleton's publisher. On about February 10, 1980, Pendleton advised Pinnacle that, at Harlequin's invitation, he was planning to visit its Toronto headquarters where he expected Harlequin to discuss the possibility of licensing to it rights in "The Executioner" series. Pendleton also indicated that he wished to halt discussions on the Pinnacle offer until he heard from Harlequin. At the conclusion of his discussion with Harlequin, Pendleton signed a preliminary agreement to license the Series and its characters to Harlequin. On May 15, 1980, Pendleton signed the formal agreement with Harlequin pursuant to which twelve books in "The Executioner" series and four to six spin-offs from that Series would be published annually by Harlequin.

Pinnacle instituted this action in September, 1980, against Harlequin seeking injunctive and compensatory relief. Pinnacle alleges that Harlequin, although fully aware of Pendleton's contractual obliga-

tions to Pinnacle and that Pinnacle was still negotiating with Pendleton, induced Pendleton to break off negotiations with Pinnacle just as final agreement on new contract terms was near. Pinnacle now moves for summary judgment. Harlequin argues against the motion for summary judgment on the grounds that the option clause on which Pinnacle bases its case is unenforceable. Alternatively, Harlequin asserts that before the "best efforts" obligation can be enforced, an evidentiary hearing must be held to determine (i) the intention of the parties regarding the "best efforts" clause; (ii) the compliance of both parties with their obligations under the clause; and (iii) Harlequin's interference with Pendleton's performance under the clause.

## DISCUSSION

To succeed in an action for interference with contractual relations, the plaintiff must establish first and foremost the existence of a valid contract.[1] *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.*, 614 F.2d 832, 839 (2d Cir. 1980).

In the instant case, Pinnacle accuses Harlequin of interfering with the option clause in the 1976 Agreement. As noted above, that clause provides that, after Pendleton has fulfilled his obligation to deliver books 29 through 38 of "The Executioner" Series, the parties would use their "best efforts" to negotiate a new contract "on terms to be agreed" for delivery of an unspecified number of new Executioner books. Clause VII of the 1976 Agreement. Harlequin contends that this clause is unenforceable because either (i) it is nothing more than an unenforceable "agreement to agree"; or (ii) the material terms of the "best efforts" clause are too vague.

Harlequin's first contention that the "best efforts" clause is an unenforceable "agreement to agree" is inappropriate in this case. Clause VII of the 1976 Agree-

ment does not require that any agreement actually be achieved but only that the parties work to reach an agreement actively and in good faith. *See Thompson v. Liquichimica of America, Inc.*, 481 F.Supp. 365, 366 (S.D.N.Y.1979).

Harlequin is correct, however, in arguing that the "best efforts" clause is unenforceable because its terms are too vague. "Best efforts" or similar clauses, like any other contractual agreement, must set forth in definite and certain terms every material element of the contemplated bargain. It is hornbook law that courts cannot and will not supply the material terms of a contract.

Essential to the enforcement of a "best efforts" clause is a clear set of guidelines against which the parties' "best efforts" may be measured. *See Cross Properties v. Brook Realty Co.*, 76 A.D.2d 445, 454, 430 N.Y.S.2d 820, 825 (2d Dep't 1980). The performance required of the parties by a "best efforts" clause may be expressly provided by the contract itself or implied from the circumstances of the case. *See Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258 (S.D.N.Y.1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979) ("best efforts" under a distribution contract based on distributor's capabilities and prior merchandising of other similar products); *Perma Research & Development v. Singer Co.*, 402 F.Supp. 881 (S.D.N.Y. 1975), *aff'd*, 542 F.2d 111 (2d Cir. 1976), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598, ("best efforts" under a patent assignment based on company's financial and other capabilities). In the case at bar, there simply are no objective criteria against which either Pinnacle or Pendleton's efforts can be measured.

Pinnacle's argument that the parties' obligations under the "best efforts" clause are clear from the circumstances of the case is without merit. While it is possible to infer from the circumstances the standard of performance required by a

---

1. Plaintiff must also establish (i) the defendant's knowledge of that contract; (ii) the defendant's intentional procuring of a breach of that contract; (iii) but for the defendant's alleged inducement, the breach would not have occurred; and (iv) damages. *Special Event Entertainment v. Rockefeller Center*, 458 F.Supp. 72, 78 (S.D.N.Y.1978); *Israel v. Wood Dolsan Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956).

"best efforts" clause where the parties have agreed to work toward a specific goal, see, e. g., Bloor, supra; Perma Research & Development, supra, it is not so here where the parties have agreed only to negotiate.[2] The performance required by a contract to negotiate with best efforts, unlike the performance required by a distribution contract or a patent assignment, simply cannot be ascertained from the circumstances.[3] Unless the parties delineate in the contract objective standards by which their efforts are to be measured,[4] the very nature of contract negotiations renders it impossible to determine whether the parties have used their "best" efforts to reach a new agreement. Certainly, no party to a negotiation, no matter what the circumstances, is required to make a particular offer nor to accept particular terms. What each party offers or demands in the course of any negotiation is a matter left strictly to the business judgment of that party. Thus, absent express standards, a court cannot decide that one party's offer does not constitute its best efforts; nor can it say that the other party's refusal to accept certain terms does not constitute its best efforts.

In the instant case, therefore, where the parties agreed only to negotiate and failed to state the standards by which their negotiation efforts were to be measured, it is impossible to determine whether Pinnacle or Pendleton used their "best efforts" to negotiate a new agreement. For instance, there simply is no objective standard by which the court can determine whether Pinnacle's officer constituted its best efforts; nor can it decide whether Pendleton's participation in negotiations with Pinnacle for over a year were his best efforts. In short, the option clause is unenforceable due to the indefiniteness of its terms. Accordingly, Pinnacle's motion for summary judgment is denied.

In view of this decision which resolves the one basic issue underlying this case, I deem Harlequin's responsive papers as a cross-motion for summary judgment which motion is granted and the complaint dismissed. No costs are awarded.

SO ORDERED.

## ON MOTION FOR REARGUMENT

By my opinion and order of May 13, 1981, the complaint herein was dismissed. The plaintiff now moves in effect for reargument and/or temporary injunctive relief pending the appeal of the May 13, 1981 order of this court.

The complaint is divided into five causes of action:

(1) unlawful interference by Harlequin with the plaintiff's contractual rights with Don Pendleton, author, under a 1976 Agreement and a 1979 Agreement executed between the author and the plaintiff;

(2) an intentional tort on the part of the defendant in that defendant maliciously deprived the plaintiff of rights to publish and distribute additional books by Pendleton, its most successful author;

(3) that, due to the contractual interference by the defendant and the intentional tort committed by the defendant, the plaintiff will suffer irreparable harm giving rise to equitable injunctive relief;

2. The only case cited by Pinnacle wherein an agreement to negotiate with "best efforts" was held to be enforceable is *Thompson v. Liquichimica of America, Inc.*, 481 F.Supp. 365 (S.D.N.Y.1979). The court in that case found that an agreement to negotiate with best efforts, unlike an unenforceable agreement to agree, constitutes a "closed proposition discrete and actionable." I disagree. In any event, that case may be distinguishable since the terms of the agreement toward which the parties were working in *Thompson* evidently were more specific and may have provided sufficient criteria against which the parties' efforts could be measured.

3. Since under Clause VII of the 1976 Agreement, every term of the hoped for agreement toward which the parties were directing their efforts is open for negotiation, the Agreement does not provide a standard against which the parties' efforts could be determined.

4. For instance, the parties could agree in the contract that "best efforts" means that they would not negotiate with others for a specific period of time or that one party has the right to match any offer received from another.

(4) that the defendant through the activities of Andrew Ettinger, a former editorial director of the plaintiff, in his position as an employee of the defendant breached fiduciary duties to the plaintiff and misappropriated plaintiff's ideas, thus, constituting unfair competition; and

(5) that because of the foregoing there is a continuing need for injunctive relief to prevent irreparable injury to the plaintiff.

The central question raised by this case involves the enforceability of the renewal clause of the 1976 contract between Pinnacle and Don Pendleton. Pendleton's obligations under the 1976 contract (if no reference is made to the renewal clause) were satisfied upon the delivery of the manuscript for the 38th book in the series to Pinnacle which occurred on December 14, 1979. In my opinion of May 13th, I held that the renewal clause is unenforceable.

■ The injunctive relief sought by the plaintiff is based solely upon the 1976 Agreement between plaintiff and Pendleton. As it appeared that the 1979 Agreement had never been executed or accepted by Pendleton, I was under the impression that the plaintiff had abandoned its claim under that alleged contract. Accordingly, upon determining that the renewal clause in 1976 contract is unenforceable, I dismissed the entire complaint.

It now appears, however, that the plaintiff believes that even if the renewal clause of the 1976 Agreement is unenforceable, they still have certain rights under the claimed 1979 Agreement. Plaintiff requests that my order of May 13 be modified so as to dismiss only those portions of the amended complaint which seek relief under the 1976 Agreement between the parties. While it appears, at this juncture, that plaintiff may have great difficulty in proving the claimed 1979 Agreement, I had no intention of depriving them of the right to litigate this matter. Accordingly, the opinion and order of May 13 is amended to restrict the relief therein to a dismissal of those portions of plaintiff's amended complaint which seek relief under the 1976 Agreement.

Plaintiff also seeks an order of this court affirmatively enjoining the defendant from publishing any of the books bearing the generic title "The Executioner" or from publicizing any such books pending the appeal of this case. It is the plaintiff's position that the appeal from my order will be in good faith and, indeed, I have no doubt that it will be so prosecuted. *See Thompson v. Liquichimica of America, Inc.*, 481 F.Supp. 365 (S.D.N.Y.1979). The plaintiff also argues that, should the defendant be permitted to proceed with publication prior to appeal, any damages incurred thereby will be most difficult of proof. It is suggested that should an order not be entered, the egg will be scrambled to such a point that should an appellant court disagree with my interpretation of the contract the parties could never be restored to the position they were in prior to the May 13, 1981 order of this court.

On the other hand, the contract whereby Harlequin obtained rights to books in "The Executioner" series from Don Pendleton was entered into many, many months ago and that the plaintiff had knowledge of that fact at or about the time that the contract was executed. Since then, Harlequin has expended large sums in order to prepare for this new venture in its business. The damage to Harlequin, should a stay be entered at this point, cannot be said to be insubstantial. It seems clear to me that the equities do not tip decidedly in favor of the plaintiff. *See Caulfield v. Board of Education of the City of New York*, 583 F.2d 605 (2d Cir. 1978). Accordingly, the requested affirmative injunction pending appeal is denied.

SO ORDERED.