ENGLISH COMPANY, Plaintiff-Appellant and Cross-Appellee, v. NORTH-WEST ENVIROCON, INC., Defendant-Appellee and Cross-Appellant.

Second District    No. 2—95—0583

Opinion filed March 20, 1996.

BOWMAN, J., specially concurring.

Robert T. Palmer, of Chicago, for appellant.

Patricia Costello Slovak and Jane M. McFetridge, both of Brittain, Sledz, Morris & Slovak, of Chicago, for appellee.

JUSTICE COLWELL delivered the opinion of the court:
Plaintiff, The English Company (TEC), and defendant, Northwest

Envirocon, Inc. (NWE), bring this appeal and cross-appeal, respectively. In its appeal, TEC asks this court to reverse the trial court's order of summary judgment finding that the term "products" as used in the Sales Representative Act (Sales Act) (820 ILCS 120/1 (West 1992)) refers only to tangible goods. In its cross-appeal, NWE argues for reversal of the trial court's denial of its motion to dismiss based on its finding that TEC's complaint under the Sales Act is statutory rather than contractual and thus the forum-selection clause in the parties' representation agreement is inapplicable.

NWE moved to dismiss the case because the parties' contract provided that any action on the contract be brought in the home state of the initial defendant and, thus, NWE argued, this case should have been brought in Washington. NWE also moved for summary judgment on the ground that, as a seller of "services" rather than "goods," it is not a principal under the Sales Act, which states that it applies only to sellers of "products." The trial court denied NWE's motion to dismiss on forum-selection grounds, finding that the forum-selection clause is against Illinois public policy. The court granted summary judgment in favor of NWE on the ground that the Sales Act does not apply to the instant situation because NWE sells services, not goods. We reverse in part, vacate in part, and dismiss.

The record reflects that defendant, a Washington corporation with a Chicago regional office, entered into a sales representation agreement with plaintiff's predecessor, The Thomas English Company, an Illinois corporation, on April 1, 1990. The agreement provided that TEC would sell NWE's environmental assessment and documentation to companies in northern Illinois and southern Wisconsin, including soliciting and accepting orders within defined parameters. TEC was to be paid fixed commissions for each sale. The agreement provided that TEC's representation of NWE could be terminated at any time by either party with 90 days' notice. Over time, TEC's sales territory was expanded to include all of Illinois, Indiana, Michigan, Wisconsin, and Iowa.

A subsequent agreement executed on March 23, 1992, allowed The English Company to succeed to the rights and duties of its predecessor (The Thomas English Company), but required that TEC accept a lower commission structure, meet higher sales goals, acquire more insurance, and forfeit all commissions earned after the effective date of any notice of termination of the agreement. This agreement also provided that commissions were to be paid on Wednesday for the previous week's receipts. Finally, the contract provided that any action at law by either party be brought in the home state of the initial defendant. NWE allegedly told TEC that its failure to accept the new

terms would result in the termination of TEC's exclusive right to represent NWE in the defined territory. The contract was executed in Chicago according to a notary seal dated March 25, 1992.

On June 10, 1993, an attorney for TEC notified NWE by letter that TEC was exercising its right of termination, effective 90 days from the date of the letter (*e.g.*, September 8, 1993). The reason cited was the invocation by NWE of a contractual clause which cost TEC $17,566.84 in lost commissions, as well as NWE's alleged harassment of and "belligerent attitude" toward TEC employees. TEC asserted that it believed that NWE was trying to force TEC to quit as its representative. The letter proposed a schedule for various winding-up activities and promised continuing good-faith efforts by TEC until the close of business on the final termination date. The letter also included a copy of a notice sent to customers stating that TEC would no longer be representing NWE after September 8, 1993. The letter made no mention of the reasons and promised to facilitate uninterrupted service to the customers. NWE responded by letter dated June 23, 1993, asserting that sending the client letter without first consulting NWE constituted a material breach of TEC's duty of undivided loyalty as NWE's agent. NWE also asserted that TEC had failed to follow NWE's written procedures regarding order documentation and record-keeping. NWE then asserted that, as a result of TEC's breach, NWE was relieved of its obligation to perform on the contract and therefore would not pay any commissions already owed or accept any more orders from TEC. NWE then demanded the return of various client files and promotional materials and instructed TEC to communicate only through counsel.

TEC wrote to NWE's counsel again on September 15, asserting TEC's right under the Sales Representative Act (820 ILCS 120/0.01 *et seq.* (West 1992)) to receive payment on all earned commissions within 13 days. There is no response from NWE reflected in the record. TEC filed the instant action on May 10, 1994. NWE motioned to dismiss under section 2—619 of the Code of Civil Procedure on forum and choice-of-law grounds based on the contract provision and under section 2—615 of the Code of Civil Procedure for failure to state a cause of action. 735 ILCS 5/2—615, 2—619 (West 1992). NWE also motioned for summary judgment on the ground that as a provider of "services" rather than "products" it was not subject to the Sales Act.

In separate orders, the trial court denied the motion to dismiss and granted the motion for summary judgment. The court found that the complaint was not brought on the contract, but rather was based on a statutory right enumerated by the legislature and, therefore, the choice-of-law and forum provisions were inapplicable. However,

the court then found the term "products" in the Sales Act referred only to tangible goods and further found that NWE provides only "services" and is therefore not subject to the Sales Act.

■ We note initially that this court reviews both section 2—619 dismissals and summary judgments *de novo*. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993); *Wiseman-Hughes Enterprises, Inc. v. Reger*, 248 Ill. App. 3d 854, 857 (1993). The trial court's denial of the motion to dismiss did not specify the section upon which it was based, but, as it was clearly based on an "issue of law or easily proved issue of fact," we will treat it as a denial of a section 2—619 motion. See *Johnson v. Du Page Airport Authority*, 268 Ill. App. 3d 409, 414 (1994).

We will first address NWE's contention in its cross-appeal that the trial court erred in finding that the contractual choice-of-law and forum clause is inapplicable. The contract provision at issue reads as follows:

> "14. *Governing Law*. The Agreement shall be tried or heard in and governed by and construed in accordance with the governing laws of the home state of the initial defendant to any action at law brought by or on behalf of the other party, including counter-suit by the initial defendant."

■ A forum-selection clause is *prima facie* valid and should be enforced unless the opposing party shows that enforcement would contravene the strong public policy of the state. *Maher & Associates, Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 74 (1994); *Calanca v. D&S Manufacturing Co.*, 157 Ill. App. 3d 85, 88 (1987). The choice of forum made in an arm's-length negotiation by experienced and sophisticated businessmen, absent some compelling and countervailing reason, should be honored by the parties and enforced by the courts. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12, 32 L. Ed. 2d 513, 521, 92 S. Ct. 1907, 1914 (1972); see *Calanca*, 157 Ill. App. 3d at 88.

However, this court may void the forum-selection clause if it violates a fundamental Illinois public policy. *Maher*, 267 Ill. App. 3d at 75; *Calanca*, 157 Ill. App. 3d at 88. When the legislature, by enacting a statute, declares the public policy of the state, the judicial branch must defer to that pronouncement. *Roanoke Agency, Inc. v. Edgar*, 101 Ill. 2d 315, 327 (1984); *Maher*, 267 Ill. App. 3d at 75; *Lyons v. Turner Construction Co.*, 195 Ill. App. 3d 36, 41 (1990). The court in *Maher*, following the reasoning of an unpublished federal district court opinion, found that the Sales Act constitutes the legislature's pronouncement that protecting sales representatives is fundamental public policy in Illinois. *Maher*, 267 Ill. App. 3d at 75, citing *Midwest Enterprises, Inc. v. Generac Corp.*, No. 91—C—2229 (N.D. Ill. 1991).

Section 2 of the Sales Act provides:

"Any provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void." 820 ILCS 120/2 (West 1992).

Quoting from *Midwest*, the *Maher* court said:

"The fact that section 2:

'[L]abels any such purported waiver "void" rather than "void as against public policy," is mere semantics; both formulations convey the same concept—the Illinois General Assembly has deemed it a "fundamental policy of the state" within the meaning of *** [section 2 of the Sales Act] to protect the relative bargaining power and thus the commissions of sales representatives working in Illinois.' " *Maher*, 267 Ill. App. 3d at 75-76, quoting *Midwest*, No. 91—C—2229.

Thus, the *Maher* court found the forum-selection clause in that case void. We note, of course, that this rationale applies to the instant case only if we concurrently find that NWE is a "principal" within the meaning of the Sales Act, a determination that hinges on our conclusions as to whether the term "products" in the Sales Act encompasses services.

However, the *Maher* court further noted that voiding the forum-selection clause does not end the inquiry. In *Maher*, as in the instant case, the contract at issue also contained a choice-of-law provision. Noting that Illinois courts follow the analysis of the Restatement (Second) of Conflict of Laws (1971), the *Maher* court found that under section 187 of the Restatement, when an express choice of law is made, it will be given effect in Illinois unless it would *both* violate fundamental Illinois public policy *and* Illinois has a materially greater interest in the litigation than the chosen state. *Maher*, 267 Ill. App. 3d at 76; *Lyons*, 195 Ill. App. 3d at 41. However, the *Maher* court further noted that the analysis contained in the Restatement is merely a guide for courts; it is not black-letter law to be upheld against all other considerations. *Maher*, 267 Ill. App. 3d at 77.

■ In the instant case, the agreement at issue was executed in Illinois between an Illinois corporation based in Itasca, Illinois, and a foreign corporation with an Illinois office. The commissions at issue were earned in Illinois, Indiana, Wisconsin, Michigan, and Iowa. The interests of the State of Washington rest solely on NWE's status as a Washington corporation. Consequently, we conclude that Illinois has a materially greater interest in this litigation than does Washington.

Even if this were not the case, we would conclude that the case should be heard in Illinois. Illinois generally follows the modern approach to choice-of-law questions, which places the greatest impor-

tance on the public policy of the state in which the case is brought. Further, we also note that the *Maher* court found that the lack of a clause providing for the award of punitive damages, as the Illinois Act provides, "would thwart the strong public policy of protecting sales representatives in Illinois." *Maher*, 267 Ill. App. 3d at 77. No punitive damages clause is included in the Washington statute. Thus, were we to find that the Sales Act applies to NWE, we would also find both the forum-selection and choice-of-law provisions void.

We next turn to TEC's contention on direct appeal that the trial court erred in concluding that the term "products" in the Sales Act refers only to tangible goods and that NWE sells only services and is therefore not a "principal" subject to the Sales Act. The larger question before us is whether the legislature intended the term "products" in the Sales Act to apply to purveyors of services as well as tangible goods. This specific question has never been addressed by Illinois courts.

The question is one of statutory construction. The cardinal rule of statutory construction, to which all other canons are subordinate, is to ascertain and give effect to the true meaning and intent of the legislature. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81 (1994); *Kenebrew v. Connecticut General Life Insurance Co.*, 882 F. Supp. 749, 753 (N.D. Ill. 1995). Courts should look to the statutory language, for the language of the statute is the best indication of legislative intent. *Solich*, 158 Ill. 2d at 81; *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 194 (1992); *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 51 (1990). Where the meaning is unclear from the language itself, the court may look beyond the language used and consider the purpose behind the law and the evils the law was designed to remedy. *Solich*, 158 Ill. 2d at 81; *Antunes v. Sookhakitch*, 146 Ill. 2d 477, 484 (1992). Where, however, the language of a statutory provision is clear, the court must give it effect (*Solich*, 158 Ill. 2d at 81; *West v. Kirkham*, 147 Ill. 2d 1, 6 (1992)) without resorting to other aids for construction (*Solich*, 158 Ill. 2d at 81; *People v. Boykin*, 94 Ill. 2d 138, 141 (1983)). Since the term "products" is not defined in the Sales Act, we must determine the legislature's intent.

■ The Illinois Sales Representative Act, section 1, paragraph 3, reads:

> "(3) 'Principal' means a sole proprietorship, partnership, corporation or other business entity whether or not it has a permanent or fixed place of business in this State and which:
>
> (A) Manufactures, produces, imports, or distributes a product for sale;

(B) Contracts with a sales representative to solicit orders for the product; and

(C) Compensates the sales representative, in whole or in part, by commission." 820 ILCS 120/1(3) (West 1992).

■ We begin by noting that the Sales Representative Act is designated as a corollary to the Illinois Wage Payment and Collection Act (Collection Act) (820 ILCS 115/1 *et seq.* (West 1992)). (" 'Sales representative' means a person who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission, but shall not include *** one who qualifies as an employee of the principal pursuant to the Illinois Wage Payment and Collection Act." 820 ILCS 120/1(4) (West 1992).) As such, it should be interpreted broadly to protect the same workers who, but for their status as independent contractors, would be protected by the Collection Act. The Collection Act does not differentiate between employers who sell services and those who sell tangible goods.

■ We next note that, were we to determine that the term "products" as used in the Sales Act refers only to tangible goods, there would be no corollary general legislative enactment to protect those who sell services on a commission basis. There are, of course, specific enactments which apply to certain services, such as the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 1992)) and the Securities Law of 1953 (815 ILCS 5/1 *et seq.* (West 1992)).

NWE argues that, if we determine that the Sales Act should be construed to apply to principals who provide services, the protection would necessarily extend to insurance agents, doctors, lawyers, and other professionals. We do not conclude that each of these groups would automatically fall under the protection of the Sales Act. The payment of insurance agents is governed by the Illinois Insurance Code, which, being more specific than the Sales Act, would supersede the Sales Act with regard to insurance agents.

The United States District Court addressed this question recently in a diversity action based on Illinois law. Initially, we note that we are not bound by a federal court decision other than a decision of the United States Supreme Court. *People v. Fern*, 240 Ill. App. 3d 1031, 1039 (1993). Nonetheless, the analysis employed here is instructive. In *Kenebrew v. Connecticut General Life Insurance Co.*, 882 F. Supp. 749 (N.D. Ill. 1995), the court outlined the principles of statutory construction and concluded that the phrase "manufactures, produces, imports, or distributes a product" in the Sales Act is plain and can reasonably be construed solely as referring only to tangible goods, not services. *Kenebrew*, 882 F. Supp. at 753. However, the court also acknowledged the persuasiveness of the plaintiff's argument, point-

ing out that the legislature's overriding intent was clearly to provide sales representatives with efficient redress should their principals fail to pay commissions in a timely fashion. *Kenebrew*, 882 F. Supp. at 753-54. This rationale would clearly apply to commissioned sellers of services as well as of tangible goods. However, the court also noted that the legislature could be expected to know what sort of sales representatives operated in its state and, therefore, could have used more inclusive language if it intended the Sales Act to apply to sellers of both goods and services. *Kenebrew*, 882 F. Supp. at 754.

Clearly, most commissioned salespeople sell tangible goods. This is likely true because of the difficulty of allowing one party to bind another to perform services. Historically, contract law has acknowledged that the sale of services is a much more personal transaction requiring a great deal more direct contact between the parties. For example, in the instant case, when TEC bound NWE to a contract with a client, NWE employees had to go to the client's place of business and spend a large amount of time performing environmental assessment tests. On the other hand, if NWE was a manufacturer of some sort of environmental device designed to improve air quality, no NWE employee would need to visit the client's place of business, but NWE would instead simply ship the device to the client. It is only in recent history that our technology and economy have advanced to the point where sales of one company's services by an intermediary was even a reasonable consideration. We note that the original contract between TEC and NWE was executed in 1990; prior to that, NWE was apparently not performing its environmental assessments in the midwestern United States. Though the record contains no information as to when NWE was founded, it is clear that there was not likely a market for its services earlier than 10 or 20 years ago. Consequently, the legislature may not have considered the possibility of commissioned service sellers, other than those already protected by other statutes, such as the Illinois Insurance Code, the Securities Law, and others.

Further, we note that the other professionals to whom NWE points as potentially being subject to the Sales Act under this construction are readily distinguished. Doctors and lawyers do not sell the services of a principal; they sell *their own* services and, thus, the Sales Act does not apply by its express terms. Even with regard to referral agreements, the essential element of the parties' relationship in that situation is missing—that one party may *bind* the other to perform services for a third party. Further, the potential *quid pro quo* aspect of this relationship, in terms of cross-referrals, would clearly remove this situation from the purview of the Sales Act. Nei-

ther party is the agent of the other and cannot commit the other to perform a service for a third party as in the instant case.

The primary case that NWE cites in support of its contention that entities providing services are not principals under the Sales Act is Dallis v. Don Cunningham & Associates, an unpublished Federal case. Dallis v. Don Cunningham & Associates, No. 91—C—2203 (N.D. Ill. December 18, 1991) (*Dallis*). In *Dallis*, the court noted that the president of the defendant company proffered an affidavit stating that his company "at no time ever manufactured, produced, imported or distributed any product for wholesale." *Dallis*, slip op. at 4; see Ill. Rev. Stat. 1985, ch. 48, par. 2251(3)(A) (now codified, as amended, at 820 ILCS 120/1(3)(A) (West 1992)). The plaintiff offered no evidence to contradict the affidavit. However, the facts make clear that Cunningham was not the originator of the "thing" being sold; rather, it was merely in the chain of distribution and, as such, would not be a principal under the Sales Act even if it sold tangible goods. *Dallis*, slip op. at 4. Further, that case was decided under an earlier version of the Sales Act (Ill. Rev. Stat. 1985, ch. 48, par. 2251), which required that a principal be a "wholesaler." Though the *Dallis* court made reference to Cunningham's status as a service-only company in rendering its decision, its finding relied on the fact that the legislature did not include parties merely in the chain of distribution as principals under the Sales Act. *Dallis*, slip op. at 4.

Despite the fact that TEC presents a persuasive argument in favor of construing the Sales Act to include services' sellers not otherwise covered by other specific enactments, we find that we are constrained by the language of the statute. We agree with the Federal court's conclusion that the language of the Sales Act is clear. Despite TEC's efforts to persuade us that the term "products" is sometimes defined broadly in common usage, we conclude that the employment of terms such as "manufactures," "distributes," and "imports" evidences the legislature's clear intent that the Sales Act apply only to purveyors of tangible goods, not services. As the Federal court noted, if the legislature had intended the Act to apply to services, it could have easily employed broader language. The unfortunate result is that TEC is left without a statutory remedy in Illinois solely because it sold services rather than goods for NWE.

For the foregoing reasons, we conclude that NWE is not a "principal" under the Sales Act. As such, the forum-selection and choice-of-law provisions are not void, as the Sales Act's public policy considerations cannot be applied to the instant case. We therefore reverse the trial court's denial of the motion to dismiss and dismiss the proceedings below pursuant to this court's authority under Supreme

Court Rule 366(a)(1). 155 Ill. 2d R. 366(a)(1). The order granting summary judgment is therefore vacated.

Reversed in part, vacated in part, and proceedings below dismissed.

RATHJE, J., concurs.

JUSTICE BOWMAN, specially concurring:
Although I concur in the majority's analysis and conclusion, I write separately to make an additional point regarding whether the term "product" in the Sales Representative Act (Sales Act) (820 ILCS 120/1 (West 1994)) encompasses both tangible goods and services or just tangible goods. Like the majority, I believe that the term "product" under the Sales Act encompasses only tangible goods. Although this conclusion is warranted by the reasons cogently explained by the majority, I believe this conclusion is also warranted by the language employed in the Sales Act when it was originally enacted in 1985.

The 1985 Sales Act provided that a "principal" was a sole proprietorship, partnership, corporation, or other business entity which, *inter alia*, "[m]anufacture[d], produce[d], import[ed], or distribut[ed] a product *for wholesale*." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 48, par. 2251(3)(A). As the term is commonly understood, "wholesale" refers to the sale of goods or commodities in quantity for resale. See Webster's Third New International Dictionary 2611 (1986) (defining the noun "wholesale" as "the sale of goods or commodities in quantity usu. for resale (as by a retail merchant)"; defining the adjective "wholesale" as "of, relating to, or engaged in the sale of goods or commodities in quantity for resale"). By employing the term "wholesale" in connection with the principal's use of the product, I believe that the legislature evidenced its intent that the term "product" encompassed only tangible goods. As the foregoing definition illustrates, services cannot be manufactured, produced, imported, or distributed for wholesale.

I recognize that the legislature amended the Sales Act in 1993 and substituted the term "sale" for "wholesale." See Pub. Act 87—948, eff. January 1, 1993 (amending 820 ILCS 120/1(3)(A) (West 1992)). While it is true that normally an amendment is presumed to change the law as it formerly existed, the circumstances surrounding the enactment of an amendment must also be considered. *Hession v. Illinois Department of Public Aid*, 129 Ill. 2d 535, 543 (1989). In this case, I do not believe that the substitution of the term "sale" for "wholesale" marked a change in the legislature's intent to have the

term "product" encompass only tangible goods. The only pertinent legislative history on Public Act 87—948 is provided by Representative Cronin's following statement:

> "(Senate Bill) 1708 amends the Sales Representative Act. Representative Levin and I have discussed this at length. It defines sales representative as one who contracts with a principal to solicit orders, deletes language providing that the Act does not apply to sales representatives who sell products to the ultimate consumer, so this applies not only to wholesale—people who sell to wholesalers—but as well as it applies to those who sell to retail outlets." 87th Ill. Gen. Assem., House Proceedings, June 18, 1992, at 142-43 (statements of Representative Cronin).

Based on the available evidence, I believe that the legislature did not intend to change the meaning of "product" to encompass services when it substituted the term "sale" for "wholesale." Accordingly, subject to the foregoing analysis, I concur with the analysis and conclusion of the majority.