**LABORATORY CORPORATION OF AMERICA, INC., f/k/a National Health Laboratories, Inc., Plaintiff,**

v.

**UPSTATE TESTING LABORATORY, INC., f/k/a Omnilab, Inc., Defendant.**

No. 95 C 0085.

United States District Court, N.D. Illinois, Eastern Division.

May 20, 1997.

Matthias A. Lydon, Timothy P. O'Connor, Winston & Strawn, Chicago, IL, for Plaintiff.

Jay Williams, Schiff, Hardin & Waite, Chicago, IL, Christopher Massaroni, DeGraff, Foy, Holt–Harris, Mealey & Kunz, Albany, NY, Roger J. Cusick, Cusick, Hacker & Murphy, L.L.P., Latham, NY, for Defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Laboratory Corporation of America ("LabCorp"),[1] has sued the defendant, Upstate Testing Laboratory ("Upstate"),[2] asserting several claims with respect to its purchase of Upstate. Upstate has counterclaimed against LabCorp concerning the same transaction. The parties have filed cross motions for summary judgment. For the following reasons, both LabCorp and Upstate's motions for summary judgment are granted in part and denied in part.

#### Background

In the fall of 1993, LabCorp entered into negotiations with Upstate for the purchase of Upstate's laboratory testing business. LabCorp and Upstate reached an agreement for the purchase of the business on December

---

1. During much of the time period at issue in this case, LabCorp was known as National Health Laboratories. For consistency, the name LabCorp will be used for all references to both Laboratory Corporation of America and National Health Laboratories.

2. Again, during the time period at issue in this case, Upstate was known as OmniLab. For consistency, the name Upstate will be used for all references to both Upstate Testing Laboratory and OmniLab.

17, 1993. The agreement consisted of two parts. One part was an asset purchase agreement ("purchase agreement") which detailed the specific assets that LabCorp was purchasing for the sum of 5 million dollars. As part of the purchase agreement, Upstate warranted to LabCorp that it had no "knowledge of any pending or contemplated change" in its customer list or volume of testing in the future. Purchase Agreement § 3.6. The parties also provided that New York law would govern any disputes arising under the purchase agreement. *Id.* § 12.10.

The second part of the accord was an escrow agreement. The parties placed 1.3 million dollars of the purchase price into escrow in the event that some of Upstate's customers might discontinue their use of laboratory services after LabCorp's acquisition. Specifically, LabCorp knew that Upstate's contracts with three medical facilities, Hudson Headwaters Health Network ("HHH"), Compre–Care, Inc. ("CCI"), and Benedict Health Center ("BHC") (collectively, "health centers"), were set to expire on December 31, 1993. LabCorp agreed to use its "best efforts" to secure a renewal of the contracts with the health centers. *Id.* § 11. Depending on the success of these efforts, the parties devised a formula for the distribution of funds held in the escrow account. Escrow Agreement § 3(e). In the event of a dispute involving the escrow agreement, the parties agreed to bring suit in Illinois and to have Illinois law govern the contract.

The seeds of this dispute began on February 24, 1994 when HHH and CCI notified LabCorp that they would not be renewing their contracts and would stop sending their laboratory work to LabCorp as of March 10, 1994. Pursuant to the formula in the escrow agreement, LabCorp claimed to be entitled to $550,738, representing a partial refund of the purchase price. Upstate balked at this claim and instead insisted that it was entitled to $200,000 from the escrow account. Litigation ensued. Upstate fired the first salvo by filing a complaint against LabCorp in New York state court. LabCorp returned fire the next day with a suit of its own in Illinois state court. After several rounds of legal wrangling regarding jurisdiction, LabCorp's case landed in this Court, and the Northern District of New York dismissed Upstate's complaint. The case presently is before me on the parties' cross-motions for summary judgment.[3]

## Best Efforts

Both LabCorp and Upstate have moved for summary judgment on Count I of the complaint and counterclaim. Upstate claims that LabCorp breached the purchase agreement by failing to use its best efforts to retain the health centers' testing business. Upstate asserts that LabCorp made virtually no efforts to win renewal of the contracts and instead preferred to focus on staking its claim to the escrow fund. LabCorp asks this Court to declare that the best efforts clause is unenforceable as a matter of law because the clause lacks any clear standards by which to judge LabCorp's performance. In the alternative, LabCorp states that it used its best efforts to secure renewal, and, in any event, Upstate has failed to demonstrate that the breach of the best efforts clause actually caused damage to Upstate because the health centers would not have renewed the contracts under any circumstance.

■■■ As a matter of law,[4] the best efforts clause in this case is enforceable. To be

---

3. A court may award summary judgment to the moving party only when there is no genuine issue of material fact and that party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A genuine issue of material fact exists when a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

4. The "best efforts" clause appears in the purchase agreement which has a choice of law provision stating that it is governed by New York law. Under Illinois law, an express choice of law provision will not be given effect if "it would both violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen [forum]." *English Co. v. Northwest Envirocon, Inc.,* 278 Ill.App.3d 406, 663 N.E.2d 448, 452, 215 Ill.Dec. 437, 441 (2 Dist.1996). Neither party has contested the application of New York law to this portion of the dispute, and based on the above test, I see no reason to disturb the choice of law provision in the purchase agreement.

enforceable, a best efforts clause must have a "clear set of guidelines against which the parties' 'best efforts' may be measured." *Pinnacle Books, Inc. v. Harlequin Enters.*, 519 F.Supp. 118, 121 (S.D.N.Y.1981) (citation omitted). These guidelines either may be stated expressly in the contract, or they may be "implied from the circumstances of the case." *Id.*

■ In the instant case, the purchase agreement contained no standards for assessing LabCorp's best efforts. Yet these standards can be implied from the surrounding circumstances. The parties' goal was the retention of the health centers' accounts. To that end, LabCorp had fairly elaborate internal policies and procedures for the acquisition and retention of laboratory testing accounts. Specifically, LabCorp had a program known as "Client SAVE Alert" which identified accounts that were in jeopardy to receive heightened attention and service by the account representative and, if necessary, management. Defendant's Exh. HH. Furthermore, LabCorp had general guidelines for resolving problems and ensuring account retention. *Id.* Exh. LL. Because LabCorp was in the business of providing medical testing laboratory services for hospital and other medical providers, Upstate certainly could expect that, at the least, LabCorp would follow its own internal policies and procedures when using its best efforts to pursue the health centers' business.

The following facts are undisputed with respect to LabCorp's efforts. LabCorp took several steps toward retaining the health centers' business. After the acquisition of Upstate, LabCorp hired Dr. Steven Levenston, one of Upstate's founders, as a consultant to assist it with its pursuit of the health centers' business. Dr. Levenston "aggressively" pursued this business "by telephone, letter, meeting and otherwise." Upstate's 12(N)(3)(a) Response ¶ 41. In addition, Evelyn Peterson, Associate Regional Director of LabCorp, went with Dr. Levenston to a meeting with Dr. John Rugge, Executive Di-

rector of the health centers, in which she made a proposal regarding additional services that LabCorp was willing to provide the health centers. She reiterated her verbal proposal in a written letter to Dr. Rugge. Def. Exh. PP. Finally, LabCorp hired Roberta Wasson, the Upstate account representative who had worked with the health centers accounts, to continue in her customer service capacity. Records kept by Ms. Wasson reveal that she made several phone contacts and personal visits to the health centers to check on their levels of satisfaction and resolve any problems. *Id.* Exh. QQ.[5] Given these efforts, I cannot say that LabCorp did not put forth some effort to retain the health centers' accounts.

■ Whether these efforts were enough to satisfy the "best efforts" standard, however, is an issue for a trier of fact. *Kroboth v. Brent*, 215 A.D.2d 813, 625 N.Y.S.2d 748, 749 (1995). Although LabCorp sent Ms. Peterson to meet with Dr. Rugge, a question remains whether someone higher in the management chain at LabCorp should have met with Dr. Rugge and offered proposals to him. In February 1994, Dr. Levenston warned Shelley Melzer, the division manager at LabCorp, that the failure of either Mr. Melzer or Steve Stark, vice-president of LabCorp, to meet with Dr. Rugge could have serious consequences for LabCorp's success in retaining the health centers' business. Def. Exh. SS. Despite this letter, neither Mr. Melzer nor Mr. Stark ever met with Dr. Rugge. Furthermore, LabCorp may not have complied fully with its internal standards and processes for handling important accounts such as the health centers.

The issue of causation also is unresolved. Dr. Rugge, the health centers' director, testified that LabCorp was doing "exemplary work," and he never stated that LabCorp had no chance of retaining the health centers' business. Rugge Dep. at 82. In fact, Dr. Rugge stated that, despite the momentum building for a laboratory testing agreement

---

5. Ms. Wasson as well as another former LabCorp employee, Shelley Melzer, filed affidavits in connection with the "best efforts" question. LabCorp moved to strike portions of these affidavits. I need not resolve this motion because I did not

rely on any information in these affidavits to reach my conclusion. After reading the affidavits, I determined that the information contained in them would not negate the existence of genuine issues of material fact.

with Glenn Falls Hospital ("GFH"), he was still open to hearing proposals from LabCorp until a few days before February 24, 1994 when he notified Dr. Levenston of the health centers' decision. *Id.* at 114. Whether the health centers would have declined to renew their contracts with LabCorp even if Lab-Corp had used its best efforts cannot be resolved by summary judgment.

### Count IV—Breach of Contract— Forum Selection Clause

LabCorp seeks summary judgment on its breach of contract claim (Count IV) for Upstate's failure to comply with the forum selection clause. LabCorp contends that Upstate breached the contract by initiating this suit in New York state court, thereby violating the forum selection clause which designated Illinois as the situs for litigation. I agree.

■ The forum selection clause appears only in the escrow agreement and not in the purchase agreement.[6] Upstate therefore argues that its suit in New York was based on the purchase agreement, and therefore it did not have to abide by the forum selection clause in the escrow agreement. In my prior opinion denying Upstate's motion to transfer or dismiss, I held that "the question of 'best efforts' and the Asset Purchase Agreement involve a 'transaction or agreement' contemplated by the Escrow Agreement." *National Health Lab. v. Upstate Testing Lab.*, 878 F.Supp. 117, 119 (N.D.Ill.1995). Hence, Upstate was bound to litigate its claims in Illinois and could not rely on the lack of a forum selection clause in the purchase agreement to escape this binding provision. *Id.*

Upstate's initiation of a lawsuit in New York violated the forum selection clause. LabCorp has a right to enforce that provision and recover damages for its breach. *See Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 604 (7th Cir.1994) (stating that damages could have been sought for a breach of forum selection clause); *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir.1990) (holding that "one who has agreed to be sued in the forum

selected by the plaintiff has thereby agreed not to seek to retract his agreement; ... such an effort would violate the duty of good faith that modern law reads into contractual undertakings").

### Count V—Breach of Implied Covenant of Good Faith

■ Based on the breach of the forum selection clause, LabCorp also has pled a claim for breach of the implied covenant of good faith and fair dealing (Count V). This claim, however, cannot stand on its own because "this covenant does not provide a person with a separate, independent cause of action." *National Serv. Ass'n v. Capitol Bankers Life Ins. Co.*, 832 F.Supp. 227, 232 (N.D.Ill.1993). In the instant case, Lab-Corp's claim for breach of the implied covenant of good faith is co-extensive with its breach of contract claim. *Codest Eng'g v. Hyatt Int'l Corp.*, 954 F.Supp. 1224, 1233 (N.D.Ill.1996). Summary judgment will be entered against LabCorp on Count V.

Summary judgment is also appropriate on Count II of Upstate's counterclaim. It too alleges a breach of the implied covenant of good faith. That claim, however, is based on the same facts as the breach of contract claim for failure to use best efforts. Thus, summary judgment will be entered against Upstate on Count II of its counterclaim.

### Count III—Breach of Warranty

■ LabCorp claims that Upstate violated several of the warranties it made in the purchase agreement. Specifically, Upstate warranted that it did not have "any knowledge of any pending or contemplated change in the Customer list or in the volume of testing to be required by same in future." Purchase Agreement, § 3.6 Upstate also made more general warranties against adverse conditions and omitted facts. *Id.*, §§ 3.18, 3.20. LabCorp claims that Upstate breached these warranties because it knew that the health centers were negotiating with GFH to transfer their business but failed to disclose this fact. Upstate disputes this con-

---

**6.** The Escrow Agreement designates Illinois law as the governing law. Accordingly, Illinois law applies to this Count as well as Count V for breach of the implied covenant of good faith.

tention and has moved for summary judgment on Count III.

The record is unclear whether and when Upstate knew that the health centers would transfer their account to GFH. The relationship between the health centers and GFH was a continuing one, even throughout the duration of Upstate's business relationship with them. Rugge Dep. at 82–83. Upstate knew about this continuing relationship and GFH's desire to recapture the health centers' lab work. *Id.* at 69; Levenston Dep. 9/13/95 at 83, 158. What remains unclear, however, is the extent of Upstate's knowledge regarding the seriousness of the health centers' interest in GFH's overtures and whether Upstate communicated that information to LabCorp. Steven McClintic, an executive with GFH, indicated that his first "sit down" meeting with the health centers did not occur until October 1993 and that he did not consider the deal closed until the actual testing business began to come to GFH. McClintic Dep. at 144, 147. Yet as early as October 19, 1993, Mr. McClintic and GFH were making detailed plans incorporating the HHH account, one of the health centers, into its business structure and had set a target date of February 1st to complete the transition. *Id.* at 162–63; P1. Exh. 61. Dr. Rugge, however, indicated that he still was willing to hear proposals from Upstate and Dr. Levenston up until the point that a contract was signed with GFH, Rugge Dep. at 87, thereby indicating to Dr. Levenston that the health centers' negotiations with GFH had not advanced to such a serious stage. In any event, Dr. Levenston believes that he told Messrs. Stark and Melzer, both of LabCorp, that GFH was negotiating with the health centers. Levenston Dep. 9/13/95 at 166–67.

In direct opposition to Dr. Levenston's deposition, Mr. Stark testified that no one ever mentioned, prior to the closing, GFH as a potential competitor for the health centers' accounts. Stark Dep. at 323. Likewise, Vivian Strolis, one of LabCorp's chief negotiators, stated that she could not recall any mention by Dr. Levenston regarding GFH's pursuit of the health centers' business. Strolis Dep. at 377–78. Instead, he only gave her a general indication that competitors were interested in the account. *Id.* at 378–79.

Given these conflicting statements, I cannot determine how much Upstate and Dr. Levenston knew about GFH's negotiations with the health centers. I also cannot determine what information Upstate and Dr. Levenston communicated to LabCorp regarding the competition for the health centers' accounts. Consequently, genuine issues of material fact exist as to whether Upstate breached its warranties to LabCorp.

### Fraud

In Count III of its counterclaim, Upstate claims that LabCorp committed fraud because LabCorp never had any intention of using its best efforts to maintain the health centers' accounts. Upstate has moved for summary judgment in its favor on this count,[7] but, in fact, summary judgment against Upstate properly disposes of this count.

Under New York law,[8] a failure to perform in the future according to a provision of a contract does not constitute a separate tort for fraud but rather is merely part of a breach of contract action. *Pacesetter Motors v. Nissan Motor Corp.*, 913 F.Supp. 174, 183–84 (W.D.N.Y.1996). In these circumstances, "a claim for fraud will be dismissed 'when the only fraud charged relates to a breach of contract.'" *Vista Co. v. Columbia Pictures Indus., Inc.*, 725 F.Supp. 1286, 1294 (S.D.N.Y.1989) (citation omitted).

Upstate's fraud claim is indistinguishable from its breach of contract claim. Both claims are based on LabCorp's alleged failure to use best efforts in contradiction of the express terms of the contract. Based on the holdings in *Pacesetter* and *Vista*, the fraud claim cannot survive because it is not independent of the breach of contract claim.

---

7. Upstate also moved for summary judgment on LabCorp's claim of fraud. LabCorp voluntarily dismissed its fraud count, and accordingly, I will not address it.

8. New York law applies to this count because it involves the "best efforts" clause in the purchase agreement.

*Meaning of "Annualized"*

The parties also are seeking partial summary judgment on various other "claims." A review of the motions reveals that these "claims" are not actual counts in the complaint or counterclaim. Rather, they are issues relating to certain counts or counterclaims. As such, they are not capable of resolution on summary judgment. Fed. R.Civ.P. 56. Nevertheless, I will treat the parties' motions as motions in limine with respect to any of these issues which can be resolved in that manner.

LabCorp and Upstate each seek a declaration that their interpretation of "annualize", as that term is used in the escrow agreement, is the correct interpretation. The escrow agreement provides that the distribution of the funds will be based on the "Purchaser's [LabCorp] annualized net sales on an accrual basis for the six (6) month period from the Closing Date through June 21, 1994 (the 'Contingent Contract Period') generated from the Contingent Contracts [the health centers contracts] . . ." Escrow Agreement, § 3(e). LabCorp argues that the sales amount to be annualized should not include those sums from the accounts which had terminated their service contracts with LabCorp prior to June 21, 1994. The idea behind the creation of the escrow agreement was to provide a rebate in the purchase price if the health centers' business failed to continue. Because two of the health centers, HHH and CCI, would no longer be sending any business to LabCorp,[9] no reason exists for estimating what the value of their business would be on an annual basis.

Upstate takes a different view of the term. Upstate contends that "annualize" simply means doubling the sales figures obtained during the six month period. It states that this simple calculation was all that the parties contemplated by the term, and they did not provide for any exceptions to that formula. Upstate argues that LabCorp has invented a new definition of "annualize" solely for purposes of litigation.

The resolution of this issue hinges on interpretation of the escrow agreement. In the present case, the term "annualize" is ambiguous, and after consideration of the extrinsic evidence, I conclude that it cannot be decided prior to trial.

The term is not defined in either the purchase or escrow agreements, and the context of the agreements does not provide any further illumination on how the term is to be applied. The term is reasonably susceptible to the interpretations of both parties given the circumstances. LabCorp's interpretation is reasonable in light of the purpose behind the escrow agreement. Simply doubling the sales figures for the terminated contracts could give Upstate an undeserved windfall because the escrow agreement was designed to address the possibility of a loss of the health centers' business. On the other hand, Upstate's interpretation may be reasonable because it provides a simple and straightforward means of calculating annual sales amounts based on the time period stated in the escrow agreement, which mentions nothing about including only those contracts which had not been terminated.

The extrinsic evidence in this case does not reduce the level of ambiguity in the term. The deposition testimony of various people from LabCorp and Upstate demonstrates that the parties may not have shared the same understanding of "annualized" when they concluded the agreements. Catherine Prvanov, a LabCorp employee, stated that no specific discussions occurred among the parties regarding the meaning of annualize but that she believed the sales figures would be doubled "provided that you thought business would continue." Prvanov Dep. at 157–58. Ms. Prvanov, however, also testified that everybody in the room during the closing of the agreements understood that the term annualize simply meant doubling the sixth month sales figures. *Id.* at 163. Dr. Levenston, testifying on behalf of Upstate, said that the meaning of the term was not discussed at the closing and that simply doubling the amounts "is implicit in the word." Levenston Dep.

---

9. The third member of the health centers, BHC, stopped sending its business to LabCorp on December 8, 1994.

9/3/96 at 101. The testimony does not reveal that anyone involved had a clear and expressed understanding of the term "annualize." *See Bluefield Assocs. v. Rarco–Bluefield,* No. 87–1521, 1987 WL 24393 at *2 (4th Cir. Dec.7, 1987) (holding that question of parties' differing definitions of annualized was an appropriate jury issue).[10]

### Damages

LabCorp also seeks a ruling that Upstate's recovery be limited to $200,000 because, pursuant to the escrow agreement, Upstate could have received no more than this amount from the escrow account. In addition, LabCorp asserts that Upstate is not entitled to punitive damages for a simple breach of contract. LabCorp is correct on both contentions.

■ The award of damages for a breach of contract seeks "to put the victim where he would have been had the breach ... not taken place." *Chronister Oil Co. v. Unocal Refining & Marketing,* 34 F.3d 462, 464 (7th Cir.1994). Given this specific objective, an award of more than $200,000 to Upstate, if it should prevail, would be unjust. If LabCorp had used its best efforts to retain the health centers' business and, in fact, had retained that business, Upstate would have received no more than $200,000 from the escrow fund. Escrow Agreement § 3.5(e). Thus, to place Upstate in the position in which it would have been absent LabCorp's breach will require an award of damages no greater than $200,000. Without any other causes of action independent of its breach of contract claim,[11] Upstate's recovery is limited to the amount specified in the escrow agreement.

■ Furthermore, Upstate is not entitled to punitive damages. In New York,[12] puni-

tive damages for a breach of contract may be recovered only if

(1) the defendant's conduct is actionable as an independent tort,

(2) the tortious conduct demonstrates "such wanton dishonesty as to imply criminal indifference to civil obligations,"

(3) the conduct was directed at the plaintiff, and

(4) the conduct is part of a pattern directed at the general public.

*Greenspan v. Allstate Ins., Co.,* 937 F.Supp. 288, 295 (S.D.N.Y.1996) (citing *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 634 N.E.2d 940, 943–44, 612 N.Y.S.2d 339 (Ct.App.1994)). LabCorp's alleged inaction does not rise to this level; it amounts to nothing more than a simple breach of contract. Consequently, Upstate may not recover punitive damages.

### Conclusion

Because issues of genuine material fact remain to be determined at trial, summary judgment is denied to both LabCorp and Upstate on Count I of the complaint and counter claim and Count III of the complaint. Summary judgment, however, is appropriate in favor of LabCorp on Count IV of the complaint and Counts II and III of the counter claim. Summary judgment also is granted to Upstate on Count V of the complaint. LabCorp's motion in limine to limit Upstate's damages is granted, but the parties' motions in limine for an interpretation of "annualize" are both denied.

---

10. Because the contract is ambiguous, and the extrinsic evidence is disputed, the interpretation of the contract is a question of fact, not law. *See Taracorp, Inc. v. NL Indus., Inc.,* 73 F.3d 738, 743 (7th Cir.1996).

11. As noted earlier, Upstate's claims for fraud and breach of implied covenant cannot proceed as independent causes of action.

12. Although the parties have not discussed the issue of which state's law governs this aspect of the dispute, LabCorp relied on Illinois cases to make its argument. Nevertheless, I believe New

York law should govern this matter because the punitive damages question is based on the "best efforts" clause in the purchase agreement, which is governed specifically by New York law. In any event, the outcome would be the same under Illinois law. *See Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628, 638 (7th Cir.1992); *McIntosh v. Magna Sys., Inc.,* 539 F.Supp. 1185, 1190 (N.D.Ill.1982) (holding that punitive damages may not be awarded for a breach of contract unless the breach itself is or is accompanied by an independent tort involving fraud, malice or oppression).